# CASES

# SUPREME COURT OF ALABAMA.

## NOVEMBER TERM, 1897.

---

## State ex rel. Winter v. Sayre.

### *Proceedings in the Nature of Quo Warranto.*

*1. Constitution law; establishment of inferior courts; power of legislature.*—Under the Constitution, inferior courts of law and equity are of legislative creation and institution, deriving their vitality and existence from legislative power granted by the Constitution, and such courts are distinguished from all other courts or tribunals to which the Constitution refers.

2. *Same; judges of inferior courts; appointed and hold office subject to legislative enactment.*—The Constitution, by provisions of the sixth article having special reference thereto, expressly reserves to the legislature the power to provide the mode in which judges of inferior courts shall be elected or appointed, and to prescribe the tenure or term of office of such judges, and how vacancies occurring therein must be filled; and the judges of the inferior courts are, therefore, separated and distinguished from the judges of the courts of the Constitution, so far as the constitutional provisions prescribe the terms of office of judges, their mode of election or appointment and the filling of vacancies that may occur in such offices.

3. *Same; same; constitutional provisions as to filling of vacancies not applicable.*—Section 17 of Article VI of the Constitution, providing that "vacancies in the office of any of the judges or chancellors of this State shall be filled by appointment by the Governor,.and such appointee shall hold his office for the unexpired term," is not applicable to judges of inferior .courts of law and equity, and the Governor is not, by the Constitution, invested with power by appointment to fill va-

[State *ex rel.* Winter v. Sayre.]

cancies occurring in the offices of such judges; and the extension of such power to the Governor by construction would be a limitation upon, and in derogation of, the plenary power granted by the Constitution to the legislature to prescribe the mode of election or appointment, and the tenure or term of office of such judges and to provide for the filling of vacancies that may occur in such offices.

4. *Same; statute providing for filling of vacancies in the office of judge of Montgomery City Court; not violative of section 17 of Article VI of Constitution.*—The act of the General Assembly "to authorize the Governor, by and with the advice and consent of the Senate, to appoint the judge of the City Court of Montgomery," approved February 13, 1879, (Acts of 1878-79, p. 418), is not violative of section 17 of Article VI of the Constitution, because it is provided in said act that "in case of any vacancy in said office of judge of said City Court, * * * such vacancy shall be filled by the Governor, and the person thus appointed shall hold the office until the close of the next ensuing session of the General Assembly;" such provision of the act being within the plenary power granted to the legislature with reference to the judges of inferior courts, and, therefore, no infraction of the section and article of the Constitution referred to.

5. *Same; same; not violative of section 2, Article IV of the Constitution.*—The title of the act approved February 13, 1879, entitled "An act to authorize the Governor, by and with the advice and consent of the Senate to appoint the judge of the City Court of Montgomery," (Acts of 1878-79, p. 418), is broad enough to comprehend the clause in the second section of said act, which provides that "in case of any vacancy in said office of judge of said City Court, after the passage of this act, such vacancy shall be filled by the Governor, and the person thus appointed shall hold office until the close of the next ensuing session of the General Assembly and until his successor is appointed and confirmed," and such act does not infringe section 2 of Article IV of the Constitution, which requires that "each law shall contain but one subject, which shall be clearly expressed in its title;" such clause of the act referred to conferring on the Governor a mere subsidiary power having relation to the general main power conferred, and being necessary to make a complete enactment in regard to the single subject expressed in the title and to which the act is devoted.

6. *Same; construction of act providing for appointment of judge of Montgomery City Court; term of judge of City Court.*—Under the provisions of the act approved February 13, 1879,

[State *ex rel.* Winter v. Sayre.]

to authorize the Governor, by and with the consent of the Senate, to appoint the judge of the City Court of Montgomery (Acts of 1878-79, p. 418), a judge of said court appointed by the Governor and confirmed by the Senate, holds his office for six years, and there can be no "unexpired term" of a judge of said court who dies or resigns, but the term covered by his commission ends upon his resignation or death; and, therefore, section 17 of Article VI of the Constitution providing that "vacancies in the office of any of the judges or chancellors of this State shall be filled by appointment by the Governor and said appointee shall hold his office for the unexpired term," has no application whatever to appointments to the office of judge of said City Court of Montgomery.

7. *Same; same; same.*—Under the express provisions of the act authorizing the Governor, by and with the advice and consent of the Senate, to appoint the judge of the City Court of Montgomery, (Acts of 1878-79, p. 418), in the event of any vacancy in the office of judge of said court, between the sessions of the General Assembly, the *pro tempore* appointee of the Governor holds the office only until the close of the next ensuing session of the General Assembly, at which time his successor is to be appointed by the Governor by and with the consent of the Senate.

8. *Same; same; same.*—Under the provisions of the act authorizing the Governor, by and with the consent of the Senate, to appoint the judge of the City Court of Montgomery, (Acts of 1878-79, p. 418), if during the term of six years for which the person appointed by the Governor and confirmed by the Senate is entitled to hold office, such judge should die or resign, his term instantly ends, and the person who, at the next ensuing session of the General Assembly, is appointed by the Governor and confirmed by the Senate as the judge of said City Court enters upon a new and independent term, and is entitled to "hold his office for six years and until the close of the session of the General Assembly at which his successor is appointed and confirmed," as provided by the first section of said act.

(COLEMAN, and HEAD, JJ., *dissenting*, hold that section 17 of Article VI of the Constitution, which provides that "vacancies in any of the offices of the judges or chancellors of this State shall be filled by appointment by the Governor, and such appointee shall hold his office for the unexpired term," is applicable and refers to judges of inferior courts of law and equity, and confers upon the Governor the exclusive power to fill vacancies occurring in the office of such judges, and

[State *ex rel.* Winter v. Sayre.]

secures to the appointee the right to serve out the unexpired portion of the term; and that, therefore, the act approved February 13, 1879 (Acts of 1878-79, p. 418), being in violation of this provision of the Constitution, is void, and that upon the resignation of the incumbent, the Governor's appointee was entitled to serve out the unexpired term of six years.)

APPEAL from the Circuit Court of Montgomery.

Tried before the Hon. JOHN R. TYSON.

The facts of the case are sufficiently stated in the opinion.

THOS. G. & CHAS. P. JONES, TOMPKINS & TROY, FRANCIS G. CAFFEY, TROY & WATTS, W. A. GUNTER, FARNHAM, CRUM & WEIL, GEORGE M. MARKS and GORDON MACDONALD, for appellant.—The errors assigned involve two questions: 1. Did section 17 of Article VI of the Constitution govern Winter's appointment and entitle him to hold for the "unexpired term" of six years, beginning at the end of the session of the Senate, 1892-93? 2. If section 17 of Article VI of the Constitution does not govern Winter's appointment, and there was a vacancy caused by expiration of Winter's term, was there any law which authorized the Governor and Senate to fill that vacancy and thus clothe Sayre with title to the office? We insist that the last clause of section 2 of the act is inoperative, not only because it is in conflict with section 17 of Article VI, but also because that part of the act is violative of section 2 of Article IV of the Constitution. This latter contention will be discussed further on. Relator's right to the office is settled in his favor by the plain language of section 17 of Article VI. The judge of the City Court is a "judge of this State." Looking alone to the Constitution, we have no hesitation in affirming that it is. Article VI of the Constitution is headed "Judicial Department." Judicial Department of what? Of the State of Alabama. The first section vests the judicial power "of the State" in certain named courts, including such "inferior courts of law and equity" as the General Assembly may establish. If the judicial power of the State is vested, in part, in inferior courts of law and equity, how it is possible to say that the judge of the inferior court, who exercises that

judicial power of the State is not "a judge of this
State?"  But this is not the only part of the article
defining and distributing the judicial power of the
State, which emphatically makes the judges of "inferior
courts" "judges of this State."  Section 13 of Article
VI expressly does so, when it provides that such judges
shall be elected or appointed, etc.  "Judges of the City
Court," singling them out from judges of other inferior
courts, are expressly recognized as judges of this State
in section 14, which prescribes the same qualifications
for the highest judges of the State.  There could not
be a plainer manifestation of an intention to declare
them "judges of this State."  The judges of "inferior
courts" are again recognized as "judges of this State"
in the provision making them conservators of the peace.
The "City Court" and the presiding judges thereof are
again mentioned as judges, in section 18, which pro-
vides for cases of incompetency of the presiding judge.
They are also recognized as judges of this State in sec-
tion 22, which makes provision for the appointments of
clerks of the "inferior courts." It would hardly be pos-
sible to clothe the judges of City Courts, as soon as they
come into existence, with all the attributes of judges
of this State, more emphatically than has been done in
the article upon the Judicial Department.  The test
whether a person is a "judge of this State" is to ascer-
tain what power he exercises and what authority con-
fers it.—*State v. Bowen,* 8 S. C. 400.  With the excep-
tion of the right to try titles to land, the judge of the
City Court of Montgomery is superior in authority and
extent of his jurisdiction to either the chancellors or
circuit judges.  His court has original jurisdiction at
law and in equity; while Circuit Court judges and chan-
cellors have not.  The City Court judge has the same
authority as the Circuit Court judge, *coextensive with
the State,* to issue writs of supersedeas, quo warranto
and all other remedial and original writs, which are
grantable by judges at common law.—*E. & W. R. R. Co.
v. E. T., V. & G. R. R. Co.,* 75 Ala., 275.  He is expressly
named, with circuit judges and chancellors, as one of
the officers who may call upon the Governor for troops
to aid in the preservation of the peace, and who, when
the urgency is great, is so highly trusted that he may

[State *ex rel.* Winter v. Sayre.]

order them out for that purpose, without waiting the
Governor's consent.—Code, §§4703, 4704. Indeed. he
exercises all the powers of any of the judges of original
jurisdiction; and in dignity of position and extent of
jurisdiction the judge of the City Court is the peer, if
not the superior, of all other judges of courts of original
jurisdiction in the exercise of the judicial power "of
the State." He expounds and enforces State laws, and
the laws of the State only. He is as completely a judge
of this State as the circuit judge or chancellor. If the
City Court judge is not one of the "judges of this State,"
what is he? How is it possible to create one? What
other appellation will truly describe him?—*People v.
Carr*, 100 N. Y. 236, a case directly in point under sim-
ilar constitutional provisions. See also *Common-
wealth v. Dumbauld,* 97 Pa. St. 293; *Shelby v. Alcorn,*
36 Miss. 273; *Montgomery v. State,* 107 Ala. 372; *Burch
v. Hardwicke,* 30 Gratt. 24; *State v. McKee,* 69 Mo. 504.

Section 17 is sweeping in its terms, and is an *express
grant of power* to the Governor, and, to that sweeping
extent, a denial of all legislative power over appoint-
ments to fill vacancies. As said in Story on the Con-
stitution, §§424-426, "Where a power is granted in
general terms, the power [power of appointment] is to
be construed as co-extensive with the terms, unless some
restriction upon it is deducible from the context."
When the language is plain there is no resting place for
construction.—*C. & O. R. R. Co. v. Miller,* 19 W. Va.
408; Cooley Const. Lim. (5th ed.), 70.

When the "terms of an act are plain and unambigu-
ous, they must be so expounded and executed, wholly
regardless of the court's views as to inconveniences, or
even absurdities which may result from giving effect
to all according to its terms."—*Abley v. Dale,* 73 E. C.
L. Rep. 390; *Douglass v. Freeholders,* 38 N. J. L. 214;
*Clark v. R. R. Co.,* 81 Me. 477; *Bartlett v. Morris,* 9
Port. 268; Sedgwick on Const. Construction, pp. 251-
261; Broom's Legal Maxims, (5th ed.), 551. "Subtlety
and ingenious refinements are dangerous instru-
ments in the construction of the Constitution, and
narrow, technical reasoning is misplaced when it is
brought to bear upon the instrument framed by the peo-
ple themselves, for themselves, and designed as the

chart upon which every man, learned and unlearned, may be able to trace the leading principles of government."—Cooley Con. Lim., 72; *People v. Purdy,* 2 Hill, 35.

In interpreting clauses of statutes, as in the construction of statutes, it must be presumed that words should have been employed in their natural and ordinary meaning. Let us test the meaning of section 17 by the "four corners" of the instrument. The first section of Article VI on the Judicial Department, names the instrumentalities in which the judicial power of the State shall be vested; and among them, "inferior courts." This section is in no proper sense a grant of power to the legislature to establish "inferior courts." That sovereign power was vested in the legislature by section 1 of Article IV, by the grant of legislative power.—*Dorman v. The State,* 34 Ala. 234. The power to create courts is given by section 1 of Article IV, and exists, unless taken away in other portions of the instrument. The only effect of section 1 of Article VI, by its enumeration of the courts in which the judicial power shall be vested, is that it does not by exclusion imply a limitation or prohibition of the power already given by section 1 of Article IV to create these particular courts. If there is any conflict, it is only between sections 13 and 17; for it can not be conjured up by construing either of these sections with any other provision of the Constitution. One part of the Constitution may qualify another, so as to restrict its operation, or apply it otherwise than the natural construction would require if it stood by itself; but one part is not to be allowed to defeat another, if by reasonable construction the two can stand together.—Cooley Con. Lim., p. 72. If then, there is any possible construction by which the whole meaning of the words of section 17 can have full effect, along with those of section 13, that construction *must* be adopted.—*Cantwell v. Owens,* 14 Md. 215.

There can be no possible conflict between sections 13 and 17 in any matter except as to filling vacancies in inferior court judgeships. Section 17 is the last and most comprehensive expression on the subject. The

lower court, therefore, begs all rules of construction when it finds an irrepressible conflict between the two sections, and solve it by annihilating all force of section 17 on the only point where the two sections can touch in conflict; treating section 13 as though it were the only section bearing on the question. When there is irrepressible conflict between the different parts, the last in order of position must control.—23 A. & E. Encyc. of Law, 311. Section 17 defines the whole constitutional policy or system concerning vacancies in judicial offices. It is well settled "that the general words of a statute must receive a general construction, and unless for restraining them, there can be found some ground or reason in the statute itself, they are not to be restrained by arbitrary addition or retrenchment." *Jones v. Drewry,* 72 Ala. 315. This is a case, as Lord Coke remarks, "where the words are plain without scruple, and absolute without any saving."—*Bernstein v. Humes,* 78 Ala. 139.

The Constitution intends the Governor's appointee shall not be subject to have the term reduced, because he is filling a vacancy. The real purpose of the framers of the Constitution (who were mindful of reasons which might arise for the abolition of these courts, which did not apply to others, and therefore did not deem it wise to protect them, in case of changes in the municipal divisions for which the court was created, etc.,) was to protect appointees against legislative caprice as to length of term, by a provision which barred the appointing power, or legislation in aid of it, from making the original term less which the Governor's appointee held it. The spirit and intent of the language as to the "unexpired term" are that no distinction shall be made in the term of the office, because it happens that an appointee of the Governor fills it, instead of some one elected or appointed by some other body. In other words, that the original term shall not be changed, because the Governor's appointee enjoys it. It makes no difference, however, what the effect is in this respect.— *Cantwell v. Owens,* 14 Md. 215. *Ita lex scripta est.* The Constitution has deliberately used words which have that effect, and it is not for courts by "ingenious conjectures of supposed intention" to create an intent

at war with that expressed by the plain language used, and utterly subversive of the intent and spirit which it breathes.—*People v. Wilson,* 72 N. C. 161.

The "unexpired term" is protected by the Constitution; and that term can be destroyed only by destroying the court. It has been held, even where the *term* has been protected by the Constitution, that to fall within its influence the term must be the term of a judge whose court is in existence, *and that when the court is abolished* the term falls with it, because the Constitution does not contemplate a term of office, when there is no office.—*Perkins v. Corbin,* 45 Ala. 103. But that case is also authority for the proposition that where the term *is* protected by the Constitution it can not be affected by the legislature, save as a consequence of the exercise of the power to destroy the court, and that the term which is protected is "while the court so long exists."—45 Ala., p. 119. If, therefore, any part of the term of the City Court judge is protected by the Constitution, the legislature *can not, so long as the court is permitted to exist,* change or diminish that term. The Constitution does protect the term of the appointee to fill a vacancy in the office of the City Court, in the provision *"that he shall hold for the unexpired term."* The Constitution thus fastens upon and becomes, as it were, a part of the commission, whenever an appointment is made to fill a vacancy. It is a maxim of constitutional law and common sense alike, that what can not be done directly can not be done indirectly.—*Henderson v. Mayor,* 92 U. S. 268; *Joseph v. Randolph,* 71 Ala. 499. The present is not a case where the legislature undertakes to abolish the court or to change the term of the office, but where it undertakes (if the last clause of section 2 of the act constituting the judge is constitutional), without changing the term of the office to provide an ad interim term for a vacancy —to create a term different from that unexpired term which the Constitution protects so long as the court itself is not abolished. The power the legislature derives under section 13 of Article VI is only to prescribe the mode of appointment—whether the officer shall be elected by the people or appointed in some other man-

ner, and does not include power over the term.    See opinion of Judge Caruthers in *Keys v. Mason,* 3 Sneed (Tenn.) 8; *State v. Denny,* 118 Ind. 392; *Ex parte Meredith,* 33 Grattan 129.    See to the same effect, *Banton v. Wilson,* 4 Texas 400; *Brewer v. Davis,* 9 Humph. 208; *Powers v. Hurst,* 2 Humph. 24; *Hughes v. Buckingham,* 5 Smedes & Marshall 632; *State v. Hutson,* 1 McCord 240.    When a new Constitution, as in this case, deals with two matters, relating to judges, with which the former Constitution also dealt, and the new Constitution changes the provisions of the old in *one* respect only, and not only does not change the provisions of the old Constitution in the *other* respect, but enlarges their scope in the new Constitution, it is a logical impossibility to maintain, that the new provision meant to change the policy of the new Constitution—as compared with the old—in *both* respects.—*Young v. Dake,* 5 N. Y. 467; *Wills v. Russell,* 100 U. S. 621; *Broaddus v. Broaddus,* 10 Bush 299; *Buck v. Spofford,* 31 Me. 36; *Taylor v. Woods,* 52 Ala. 474.

The part of section 2 of the "Act to authorize the Governor, by and with the advice and consent of the Senate, to appoint the judge of the City Court of Montgomery," which reads, "In case of any vacancy in said office of the judge of the City Court after the passage of this act, such vacancy shall be filled by the Governor, and the person thus appointed shall hold the office until the close of the next ensuing session of the General Assembly, and until his successor is appointed and confirmed," is void, not only because it is violative of section 17 of Article VI of the Constitution, but also because it infringes section 2 of Artice IV of the Constitution.    What is the subject of this act as expressed in the title?    The title is "to authorize the Governor, by and with the advice and consent of the Senate, to appoint the judge of the City Court of Montgomery. The words "by and with the advice and consent of the Senate," are concrete in their nature and must have some meaning.    These words, "by and with the advice and consent of the Senate" *"prescribe"* literally, and in the constitutional sense, the *"mode"* of appointment. The place of these words in the sentence, and their office is, "to set or lay down authoritatively for direc-

tion or control, give as a law or direction," concerning the Governor's power "to appoint the judge of the City Court." By inevitable implication the insertion of the words in the title forbids all appointments without the consent of the Senate. The words fasten and chain the Governor and Senate together in the exercise of power of appointment, as firmly as the ligament which bound the Siamese twins together. It is death to the power of appointment to dissever the bond.

The subject of this act is the appointment of the judge of the City Court *in the particular mode defined in the title,* to-wit: "by the Governor, by and with the advice and consent of the Senate." That title shuts out and prohibits provision for any appointment not made "with the advice and consent of the Senate"—it outlaws provision for appointments *without* its consent. *Ballentyne v. Wickersham,* 75 Ala. 536; *Cowert's Case,* 92 Ala. 94; *Ex parte Gayles,* 108 Ala. 514; *Ex parte Pollard,* 40 Ala. 77; *Walker v. State,* 49 Ala. 329; *Spigener v. Rives,* 104 Ala. 437; *State v. Silver,* 9 Nev. 227; *Thomas v. Wabash &c. R. Co.,* 40 Fed. Rep. 126; *People v. Supervisors Chatauqua County,* 43 N. Y. 10; *Rogers v. Manfg. Imp. Co.,* 109 Pa. St. 109; *Kentucky R. R. Co. v. Bourbon,* 85 Ky. 98; *Williamson v. Keokuk,* 44 Iowa 88; *In re Phoenixville Road,* 109 Pa. St. 44; *Rader v. Township of Union,* 39 N. J. L. 509; *Dewhurst v. Allegheny City,* 95 Pa. St. 437; *State v. Persinger,* 76 Mo. 346; *Brooks v. People,* 14 Col. 413.

The term of office of the judge of the City Court is six years, by all the acts constituting that court. The last act on the subject provides that "the judge of the City Court appointed and confirmed as provided in the preceding section, shall hold his office for six years, and until the close of the session at which his successor is appointed and confirmed." There was then, a term of six years, at least. When Judge Arrington resigned, six years had not elapsed from his last confirmation; and there was, of necessity, an "unexpired term" which does not end until the close of the session of the General Assembly of 1898-99. The judge "shall hold his office for six years." The last clause of section 2 of that act did not attempt to alter or change this term, in any

wise to fix its beginning or end, but only to provide for an *ad interim* occupant of the six year term, until some one succeeded him for the remainder of "the unexpired term." The act did not attempt to dissolve the original term of six years into scattered fragments, out of which to form three other and different terms, to-wit: one distinct term for that part of the original term enjoyed by the original appointee; another term for the *ad interim* holder; and then to absorb the remainder of the original term, in a new term of six years, as a consequence of the appointment made by the Governor and Senate in filling "the unexpired term." Not a word is said in that act about filling any *vacancy* by the Governor and Senate. There is not even a remote implication of any duty on the part of the Governor to make a nomination to fill a vacancy, in such a case, unless it be insinuated in the provision in the last clause of the second section that the Governor's appointee shall hold "until the close of the next session and until his successor is appointed and confirmed." The statute does not say that "after the expiration of the term of the present incumbent," any vacancy in the office however caused shall be filled in the manner prescribed for the term of six years; but it limits the power to make appointments, as we have seen, to the recurring period when expirations of terms call for appointments at the end of each six years—*Baker v. Kirk,* 33 Ind. 517; *Peters v. Board of Canvassers,* 17 Kan. 365; *State v. Chatburn,* 63 Iowa, 659; 51 Ohio St. 123; 72 N. C. 160.

The act of 1870-71, construed in connection with act of 1879, gave the Governor authority to appoint Winter—even with Constitution out of the way—and there was no vacancy at the time the Governor and Senate elected Sayre. The constitutions at the time of the passage of the act of 1879, as well as at the time of the passage of the acts of 1870-71, authorized the Governor to fill vacancies in the Circuit Court judgeships, and, hence, under the act of 1871, there was authority in the Governor to fill a vacancy in the City Court judgeship for the unexpired term. Looking, then, alone to the valid statutes concerning this office (barring out the Constitution as the original source of power), we have a lawful appointment and occupant of the office, for

[State *ex rel.* Winter v. Sayre.]

the remainder of the six years term for which Judge Arrington was confirmed; and which term has not yet expired. There was then no vacancy which the Governor and Senate could fill.—*State v. Chatburn,* 63 Iowa, 659. Apart from this, the act of 1870-71, taken in connection with the act of 1879, shows conclusively that the appointments which the latter act authorized, are to be made every six years, and at times beginning and ending with the expiration of terms. Construing the two acts together, this is the only permissible construction: The act of 1870-71, not being directly repealed, and not being entirely inconsistent with the act of 1879, must have operation at least to the extent of defining when the terms begin and end, and at what times the Governor and Senate may exercise the power of appointment given in the act of 1879. To that extent it must have effect; for it makes plain that upon which the last act is not specific and therefore leaves uncertain.—*Turner v. State,* 40 Ala. 21; Potter's Dwarris, 219; *Ogbourne v. Ogbourne,* 60 Ala. 616; *Iverson v. State,* 52 Ala. 170; *Smith v. Speed,* 50 Ala. 279. In determining when all terms begin and end, see *State v. Stonestreet,* 99 Mo. 361.

No provision of the Constitution gives the Governor and Senate any inherent or constitutional authority to appoint to this office. Whatever power the Governor and Senate have in the premises results purely from the statute, and can be exercised only to the extent and in the mode prescribed by the statute. It is very clear that section 13 of Article VI confers no power on any one to appoint the judge.—*State v. Peelle,* 121 Ind. 495. The only office of that section is to confer authority on the legislature to determine whether the judge shall be elected by the people or appointed, and if not elected, the "mode" of appointment, to occupy a term already fixed, and it can not confer any power whatever over the term. See in addition to authorities heretofore cited on this point *People v. Bull,* 46 N. Y. 57; *State v. Denny,* 118 Ind. 382. Section 13 of Article VI is in nowise self-executing. As declared of a similar constitutional provision, it can have force and effect "only to the extent that the legislature has prescribed the means of executing it."—*Brown v. Seay,* 86 Ala. 113. Al-

[State *ex rel.* Winter v. Sayre.]

though there be statutory authority to appoint originally, yet if there be an omission to provide for a vacancy appointment the pre-requisite legislation is lacking as the mode and times of making such appointment; and no one is authorized to appoint to fill the vacancy. As the Governor and Senate exercise a delegated and statutory authority, and not an original power vested in them by the Constitution, as to filling this office, the power to appoint to fill a vacancy, can not, in any wise, be implied or inhere in them, because of the power delegated by the statute to appoint originally. "Unless the power to appoint is expressed in some statute, it does not exist."—*Lane v. Kolb*, 92 Ala. 636; *Fox v. McDonald*, 101 Ala. 51; *Mayor v. State*, 15 Md. 376; *Commonwealth v. Hanley*, 9 Pa. St. 513.

HORACE STRINGFELLOW, ROQUEMORE, HILL & ROGERS and FRANCIS L. PETTUS, *contra.*—On this appeal the court must determine whether judges of the inferior courts are judges of this State within the meaning of section 17 as shown by the whole instrument; and the question thus fully stated can have only a negative answer.—Cooley on Constitutional Lim., pp. 70, 71. Did the framers of the Constitution by the use of the words "any of the judges or chancellors of this State," in section 17, intend to include judges of the inferior courts of law and equity which might or might not be established by the legislature under sections 1 and 13, Article VI thereof? We state the question thus, because "City Judges" are not mentioned in section 17, and being an inferior court *(Perkins v. Corbin*, 45 Ala. 118) would not be included in its meaning unless all inferior courts are included, whether having one, two, three, four or five judges as allowed by section 1, Article VI. While the Constitution in section 1, Article VI authorizes the legislature to establish inferior courts of law and equity, whose judges "shall be elected or appointed in such mode as the General Assembly may prescribe" (Section 13, Article VI), it is manifest that they were not contemplated as essential to the completion of the judicial department of the State. It is manifest that it was contemplated that even those existing at the time of the adoption of the Constitution

might cease to exist, and courts of the State be confined to those named in the Constitution, for it had been determined by this court that the power of the legislature to abolish them at any time existed, and its discretion in this particular was not abridged in the Constitution. In fact the Constitution "distributes all of the jurisdiction known to the common law, whether original or appellate, to courts of its own creation—the Supreme, Circuit, Chancery and Probate Courts. "These courts do not owe their existence to the legislative power and the legislature can not dispense with or abolish them." "The government under the Constitution is not complete without them." "They are emphatically the people's courts, and they proceed directly from the sovereign will."—*Ex parte Roundtree*, 51 Ala. 45; *Perkins v. Corbin*, 45 Ala. 118.

The judges of these courts established by the Constitution are made elective by the people; their terms are fixed at six years, and it is provided therein that their right to hold office for the full term therein prescribed shall not be affected by any change thereafter made by law in any circuit, division or county, in the mode or manner of election. As "government under the Constitution is not complete without these courts," and their judges were made *elective by the people* for fixed terms, it was necessary for the Constitution to make provision for vacancies, for "in the nature of things the people cannot be called upon to act immediately when the election of a person to an office filled by them is necessary to the exercise of a function of government; hence it is customary and essential to provide other means of appointment in cases to which the necessity gives rise."—*Fox v. McDonald*, 101 Ala. 70, 71.

To provide other and a speedier means of filling vacancies in the office of judges of the courts established by the Constitution, than election by the people, the manner of their original appointment, was the purpose of section 17 of the Constitution, and it has no application to any other than the judges of these courts. It is as to these judges alone, that the *necessity* for providing for the filling of vacancies *by the Constitution* exists. Section 17 was the mere rounding out and completion of the system of constitutional courts, to

which the Constitution commits all the jurisdiction known to the common law, whether original or appellate. The filling of vacancies is a natural part of the exercise of the creative power, so much so that the power to create an office implies as *necessary* thereto the power to fill vacancies. As the Constitution assumed to create these courts itself, it was natural that its exercise of the creative power should be made complete by providing for the filling of vacancies a necessary part of that power; so for the same reason it was unnatural and not to be presumed that the Constitution should provide for the filling of vacancies in the judicial office of courts which it did not create, but left their creation *vel non,* and every thing relating thereto to the discretion and even caprice of the General Assembly, made therein one of the co-ordinate departments of the government.

Constitutions are not construed so as to hamper the legislative department in the exercise of the discretion given it by the Constitution. To do so would be to defeat the very purpose for which the discretion is given. Where a discretion is expressly and *generally* given by the Constitution to the legislative department of the government to create an office, there must be something more than a *syllogism* to indicate an intention of the framers of the Constitution to impose restraints inconsistent with its proper exercise. There must be an express inhibition.—*Ex parte Lambert,* 52 Ala. 81 and 82. That the intention of the framers of the Constitution by the adoption of section 17, Article VI was merely to provide for the filling of vacancies in the offices of the judges or chancellors established therein, which were made elective by the people for fixed terms, is manifest from the result of an application of that section to judges of the inferior courts. The filling of vacancies, as we have shown, is a mere expedient, hence it is always provided that the appointee shall hold only until the original appointing power can act.—19 Amer. & Eng. Encyc. of Law, 429.

Let us consider further the inappropriateness of section 17 to judges of the inferior courts of law and equity. Suppose the General Assembly in the act of creation should provide that the judge should be ap-

pointed by the Governor, as in the case of the City Court
of Selma, (Acts 1876-77, p. 266, clearly contemplated
in the Constitution), and provide that in case of a va-
cancy the Governor shall "fill such vacancy by appoint-
ment, and the term of office of the person appointed
shall be six years from the date of his appointment."
Here there would be no occasion for filling a vacancy
for the unexpired term, for the original appointing
power, and the power usually specified, and specified in
the Constitution, to fill vacancies are the same.    Hence
the provision in the act of creation that the appoint-
ment should be for an original term.    Here there would
clearly be no operation for section 17, which was to
fill vacancies until the original appointing power, a
power *other* than the power designated to fill them,
could act.    Yet if the contention of counsel for appel-
lant be true the framers of the Constitution intended
that the General Assembly, in the exercise of its discre-
tion in the creation of inferior courts, could not in such
case provide that in the case of a vacancy the appoint-
ment should be for an original term, although it would
be silly in such case to appoint for the unexpired term,
and athough the power of the General Assembly over
the original term was unlimited.—23 Amer. & Eng.
Encyc of Law, 362, n. 3; *Sprowl v. Lawrence,* 33 Ala.
674.

Suppose again the General Assembly in the act creat-
ing an inferior court should provide that the judge
thereof should hold during good behavior.    This it
could do.    Section 1, Article VI limits the number of
judges of such courts to five, but there is no limitation
upon the length of the term other than the inhibition
in section 30, Article II, which provides that no office
shall be created for a longer term than during good be-
havior.    In such case there could be no "unexpired
term."    Each appointment must be an original one.
This illustration and others that might be given, each
clearly within the contemplation of the Constitution,
show that judges of inferior courts are foreign to the
purpose of section 17.    That that section as to these
inferior courts not only has no beneficial purpose, but
that if applied to them it would injuriously restrain
the general, beneficial intent of sections 1 and 13 of

Article VI, confiding the entire matter of the establishment of these courts and the election of their judges to the discretion of the General Assembly; a general intent, which is made the more manifest by the clear intention of the Constitution to vest in the legislature the right to alter and regulate both the compensation and the terms of inferior court judges, even during the term of an incumbent.—Article VI, section 15. .

Section 17 was intended only as a natural and necessary part of the creation of the constitutional courts. That its true and only reason was to provide a means for the filling of vacancies in the office of judges and chancellors of those courts, other than the people by whom they were made elective for fixed terms, because "in the nature of things the people cannot be called upon to act immediately when the election of a person to an office filled by them is necessary to the exercise of a function of government;" that it was not intended to apply to any other courts because the creation of all other courts was expressly confided to the General Assembly, with the same discretion and powers as to all other offices created by it, except as to the personal qualifications of the judges of the City Courts.—*Fox v. McDonald*, 101 Ala. 70-71; *Ex parte Lambert*, 52 Ala. 81; *Perkins v. Corbin*, 45 Ala. 118; *Ex parte Roundtree*, 51 Ala. 45.

As persuasive of the fact that only the constitutional judges was intended by section 17, it may be observed that when the framers of the Constitution intended to include inferior judges they use the words "any court of record in this State."—Article VI, §20.

The intent gathered from the whole instrument governs the sense with which words are used in a particular clause.—Cooley on Constitutional Lim., p. 68; 3 Amer. & Eng. Encyc. of Law, 679, note 1; *Dane v. Smith*, 54 Ala. 49.

"One part of a Constitution is not to be. allowed to defeat another if by any reasonable construction the two can be made to stand together."—Cooley on Constitutional Lim., p. 71; *Lehman Durr & Co. v. Robinson*, 59 Ala. 235. The construction of section 17, Article VI contended for by counsel for appellant would, as we have shown, tend to defeat the general purpose

of the framers of the Constitution in withdrawing judges of inferior courts from election by the people and committing them to the discretion of the General Assembly, for it would hamper its discretion. It is also inconsistent with the implied power to fill vacancies given by section 13, Article VI; a power intrusted to the legislature in every other instance of office created by it.—*The People ex. rel. v. Fitch*, 1 Cal. 526. "But if it were doubtful," whether the General Assembly had the power to provide for the filling of vacancies in the office of judge of the inferior courts of law and equity, it would be the duty of the court to sustain the exercise of such power.—*Randolph v. Baldwin*, 41 Ala. 309; *State v. Rogers*, 107 Ala. 451; *Bank v. Smith*, 3 Serg. & Rawles, 63, 73. If it can be held that section 17, Article VI was *"clearly"* intended to include judges of the inferior courts of law and equity, that might thereafter be created by the General Assembly, then it is the duty of the court, if the language of the act of 1878-79 is "fairly susceptible of an interpretation which will uphold its constitutionality to adopt it, even though it be less natural."—*Quartelbaum v. The State*, 79 Ala. 3; *Noble v. Mitchell*, 100 Ala. 531. It is the manifest purpose of section 2 of the act, that in case of a vacancy a new term of judge of the City Court of Montgomery shall commence at the close of the session of the General Assembly next ensuing such vacancy. It was not contemplated that the General Assembly should elect for the unexpired term. Hence the statute is fairly susceptible of the interpretation that in case of a vacancy the term should *expire* at the close of the next ensuing session of the General Assembly, effecting a change in the particular term in which the vacancy occurs. Under this interpretation of the act, the "unexpired term" for which an appointee would hold under section 17, Article VI, would be the changed term, and not the term as originally created.—*Oldham v. Mayor of Birmingham*, 102 Ala. 363.

That the entire matter of the terms of the inferior court judges is left by the Constitution to the discretion of the General Assembly is not left to inference, from the fact that their terms are not specified in the

[State *ex rel.* Winter v. Sayre.]

Constitution, nor from the general power conferred to create those courts, and to provide the mode for the election or appointment of their judges alone. The omission of the judges of the inferior courts from the protection accorded by section 15, Article VI to the justices of the Supreme Court, circuit and probate judges and chancellors, against changes in the mode or time of election to their office, during their incumbency, is a "clear signification" of the will of the people that the right to change the terms of the judges of the inferior courts at all times should reside in the General Assembly.—*Jones v. Drewry*, 72 Ala. 315.

Section 2 of the act of 1878-79, for the filling of vacancies by the appointment of the Governor, is not in contravention of section 2, Article IV of the Constitution, which provides that "each law shall contain but one subject, which shall be clearly expressed in its title." All the purposes of the constitutional requirement are satisfied when the law has but one general subject, which is fairly indicated in its title. It is only when matters foreign to or incongruous with the title have been included that the title has been declared misleading and deceptive, and the enactmeent pronounced void." "There must have been a *substantial* departure from the Constitution."—*State ex rel v. Rogers*, 107 Ala. 452. "The insertion into a law of matters which may not be verbally indicated in the title, if suggested by it, or connected with it, or proper to the more *full accomplishment* of the object indicated is held to be within the spirit of the Constitution."—*City Council of Mont. v. Nat. Bldg. & Loan Asso.*, 108 Ala. 339; *Fox v. McDonald*, 101 Ala. 77; *Spigener v. Rives*, 104 Ala. 437; *Ballentyne v. Wickersham*, 75 Ala. 536.

BRICKELL, C. J.—This was an information in the nature of a *quo warranto*, in which the appellant was relator, and the appellee was respondent, to test and determine the rival claims of the respective parties to the office of judge of the City Court of Montgomery. The material facts are undisputed. Thomas M. Arrington, by the nomination of the Governor, and the selection of the Senate, at the regular session of the General Assembly of 1892-93, was appointed the judge of the

court, for the prescribed term of six years, and until the close of the General Assembly, at which his successor should be appointed and confirmed. He was duly qualified, entered upon and continued in the exercise of the powers and duties of the office until the first day of October, 1895, when he resigned. Upon his resignation, the Governor appointed William S. Thorington, as his successor who qualified and remained in office until he resigned on the first day of February, 1896, and the relator was by the Governor appointed his successor, was duly commissioned and qualified, continuing in office until the close of the regular session of the General Assembly of 1896-97. During the session, the Governor nominated the respondent and two others to the Senate, for the selection and appointment of one to the office of judge of the court. The Senate selected and appointed the respondent, and on the close of the session, he was commissioned and qualified, and entered into the office, assuming and exercising its powers and duties. The circuit court rendered judgment against the relator, declaring that he was not entitled to the office, sustaining the validity of the appointment and of the consequent right of the respondent; and it is from this judgment the appeal is taken.

Two questions are involved—the first is, whether by force of the seventeenth section of the sixth article of the Constitution, the appointment of the relator was for the unexpired term of Judge Arrington, continuing until the close of the session of the General Assembly of 1898-99, and until a successor was appointed and qualified. The remaining question involves the validity of the clause of the act approved February 13, 1879, (Pamph. Acts, 1878-79, pp. 418-19·), prescribing the term of office of the judge of the court, and the mode of filling the office, which, in the event of a vacancy occurring, confers on the Governor the power to fill it by an appointment continuing until the close of the next session of the General Assembly.

The seventeenth section of the sixth article of the Constitution reads: "Vacancies in the office of any of the judges or chancellors of this State shall be filled by appointment by the Governor, and such appointee shall hold his office for the unexpired term, and until

his successor is elected or appointed and qualified."
The article is entitled, "Judicial Department," and is
devoted principally to the vesting of the judicial power
of the State; and in all former Constitutions a corre-
sponding article bearing the same title, has been de-
voted to the same purpose. The first section of the arti-
cle vests the judicial power "in the Senate sitting as a
Court of Impeachment, a Supreme Court, Circuit
Courts, Chancery Courts, Courts of Probate, such in-
ferior courts of law and equity, to consist of not more
than five members, as the General Assembly may from
time to time establish, and such persons as may be by
law invested with powers of a judicial nature." The
section is the counterpart of the same section of the
same article of the Constitution of 1868, the immediate
predecessor of the present Constitution, and varies
from the corresponding section of the like article of the
preceding Constitution—the variance is, however,
rather of form than in matter of substance. The ori-
ginal Constitution of 1819, and its successors of 1861
and 1865, vested the judicial power "in one Supreme
Court, Circuit Courts to be held in each county in the
State, and such inferior courts of law and equity, to
consist of not more than five members, as the General
Assembly may from time to time direct, ordain and
establish." Each declared the power of the General
Assembly to establish courts of chancery, and to estab-
lish in each county a Court of Probate, and contained
provisions by which the Senate was constituted the sole
tribunal for the trial of all impeachments of civil offi-
cers. If we omit the words, "and such persons as may
be by law invested with powers of a judicial nature,"
the section in its present form is simply expressive in a
single clause or sentence, of that which was manifested
by the several sections of the article of former constitu-
tions creating the judicial department and vesting judi-
cial powers, taken in connection with the sections relat-
ing to impeachments. When these words, "and such
persons as may be by law invested with powers of a ju-
dicial nature," are read and interpreted in the light of
prior legislative and judicial history, it is apparent they
were introduced into the Constitution, and properly
introduced in the connection in which they are found,

from an abundance of caution. Until the decision in *Gaines v. Harvin,* 19 Ala. 491, it was a vexed question, whether the General Assembly could confer power essentially of a judicial nature on other than judicial officers—the judges of the courts referred to in the Constitution, or the judges of inferior courts of legislative creation. After elaborate argument, and deliberate, mature consideration, in the case referred to, it was decided, that it was within legislative competency to confer such power on mere ministerial or executive officers. To avoid a recurrence of this question; to place legislative power in this respect, beyond the pale of controversy, these words were introduced into the Constitution.—*Ex parte Roundtree,* 51 Ala. 42.

In the structure of the judicial system of the State, in the creation of judicial tribunals, and in the division and distribution of judicial power, there has been but little of change in the several constitutions of the State. All have provided for a Supreme Court, defining its jurisdiction and powers, as they are now defined, with the exception of the grant to it by the present Constitution of original jurisdiction of the impeachment of particular officers. All have provided for Circuit Courts, for Courts of Chancery, for Courts of Probate, and for the election or appointment of justices of the peace; and have defined with more or less of precision the jurisdiction each court was to exercise, and the extent of the jurisdiction justices of the peace derived from the Constitution itself. The system is in itself and of itself complete; and though there has been a grant or reservation to the General Assembly of power to establish inferior courts of law and equity, there has not been any part, or any fraction, or fragment of the judicial power, left in abeyance, awaiting the happening of any future event, or the exercise of future legislative power, to vitalize or quicken it into activity. If the General Assembly never exercised the power to establish inferior courts with which it was clothed, and its exercise is purely matter of legislative discretion, the whole element of sovereignty known as the judicial power would exist, confided to tribunals which may properly be said to be of constitutional creation.—*Perkins v. Corbin,* 45 Ala. 118.

The changes in the structure of the system—the more important changes—wrought by constitutional amendment, have been in the tenure of judges, and the mode of their election or appointment. By the original Constitution of 1819, all judges held office during good behavior, and were elected by the joint vote of the two houses of the General Assembly. By an amendment adopted in January, 1830, the tenure or term of office was changed to six years, but there was no change of the mode of election until January, 1850, when an amendment was adopted transferring the election of judges of the Circuit Courts to the qualified electors of the circuits, respectively; and the election of judges of the Courts of Probate, and other inferior courts, to the qualified electors of the counties, cities, or districts, for which such courts were respectively established. The judges of the Supreme Court and chancellors remained elective by the General Assembly, until the formation and adoption of the Constitution of 1868. By that Constitution, the tenure or term of all judges, was fixed at six years, and judges of the Supreme Court were elective by the qualified electors of the State at large, chancellors by the qualified electors of the division, judges of the circuit court by the qualified electors of the circuit, judges of probate by the qualified electors of the county, and judges of the inferior courts, by the qualified electors of the county, city, town, or district, for which the court was established. The present Constitution prescribes six years as the term of office of the chief justice and associate justices of the Supreme Court, circuit judges, chancellors, and probate judges; and declares the right of these judges to hold office for the full term prescribed shall not be affected by any change of any circuit, division, or county, nor in the mode or time of election. And these judges are elected by the qualified electors of the State, of the circuits, chancery divisions, and counties, for which the courts are established. Departing from the theory and policy of former constitutions, the mode of electing or appointing, or the term of office of judges of inferior courts, is not prescribed. And emphasizing the change of theory and policy, it is declared: "The judges of such inferior courts of laws and equity as

may be by law established, shall be elected or appointed in such mode as the General Assembly may prescribe." And in this connection, it may be observed, former Constitutions had prescribed the mode of electing or appointing, and the term of office, of clerks of inferior courts, never committing the appointment to the judge of the court, while in further manifestation of the radical change of theory and policy in reference to these courts, the appointment of clerk is now committed to the judge, and the appointment endures during the term of the judge by whom it is made.

Granting to the General Assembly this unlimited power to prescribe the mode of election or appointment of judges of inferior courts, by necessary implication, the Constitution confers every particular power necessary to render the grant effectual. When an election or an appointment is prescribed as the mode of filling the office, the power is not exhausted—the term of office may be prescribed, and whatever else may be deemed necessary to subordinate the office and the court to legislative control. Without derogating from, or lessening the force of, the general grant, the Constitution could not have descended to an enumeration of particular powers the grant involved. And if it had descended to such an enumeration, the particular powers not enumerated, would have resided in the General Assembly, if not confided expressly to some other department by the government. In all its elements, under the Constitution, an inferior court is of legislative creation and institution; and it is only as of such creation and institution, there is constitutional recognition of it; and as this is its essential character, it is distinguished and distinguishable from all other courts or tribunals to which the Constitution refers.

As we have said, the intrinsic body of the judicial power is lodged by the Constitution in the courts of its own creation and protection. The appellate jurisdiction, and the powers incident deemed necessary to render it effectual, is granted to the Supreme Court. The circuit court has original jurisdiction in all matters civil and criminal, not otherwise excepted, but in civil cases only when the matter or sum in controversy exceeds fifty dollars. Courts of chancery are established,

without any special definition or description of the jurisdiction they were to exercise, and such definition or description was not necessary. Such courts were known to the common law, had been instituted here in the earliest days of organized government, exercising the jurisdiction pertaining to such courts in England, whence all our institutions were derived, so far as adapted to our condition, institutions and general jurisprudence. Courts of probate, though that particular designation was not given them by legislation until 1850, existed in each county prior to the formation of the original Constitution of 1819; and in that and all succeeding constitutions, the nature and character of the jurisdiction they were to exercise, and the purposes of their creation have been expressed in the same general terms, "for the granting of letters testamentary and administration, and orphans' business." The original jurisdiction of these courts—of the courts of chancery, and of the courts of probate—essentially and exclusively civil, is excepted from the grant of original civil jurisdiction to the circuit courts. And it is the judges of these courts—the circuit courts, the courts of chancery, the courts of probate—who are protected against legislative invasion, by any change of circuit, or division, or of the county, or in the mode or time of election. These are permanent courts, necessary constituents of the judicial system the Constitution creates, and may be said to organize, when it is read and interpreted, as it must be read and interpreted, in the light of the laws and systems existing at its formation, which are not destroyed, but preserved, so far as not repugnant to or inconsistent with its provisions. These courts statutes do not create, and whatever may be the scope of legislative power to regulate the exercise of the jurisdiction conferred upon them, or in the enlargement of their jurisdiction to meet varying conditions and necessities, statutes cannot destroy them. Inferior courts, whatever may be the title or designation given them, derive existence and vitality from legislative power; and the power that at will creates, may at will destroy. The inferior courts existing at the formation of the original Constitution, known as county courts, were abolished by the act of the General

[State *ex rel.* Winter v. Sayre.]

Assembly, approved February 9, 1850, and their rec-
ords and process transferred to the circuit courts of the
respective counties.—Pamph. Acts, 1849-50, pp. 24-36.
In the course of legislative history, quite a number of
these courts have been created and destroyed or abol-
ished at the will and discretion of the General Assem-
bly. The city court of Selma was established by an
act of the General Assembly, approved December 9,
1864, (Pamph. Acts, 1864, pp. 146-149), and was abol-
ished by an act approved December 11, 1869, and its
records and process transferred to the Circuit Court of
the county.—Pamph. Acts, 1869-70, pp. 6-8. The vali-
dity, extent and operation of the latter enactment, came
before this court for consideration in *Perkins v. Cor-
bin,* 45 Ala. 103; and after elaborate argument, the en-
actment was sustained, and its effect declared to be the
abolition of the office of judge of the court, terminating
all right of the incumbent to salary for the unexpired
term. That which is now of the more importance, is
the explicit affirmation by the court of the plenitude
of legislative power in the creation and abolition of in-
ferior courts, and the exposition of the distinction be-
tween such courts and the permanent, continuing
courts of the Constitution. This judicial determina-
tion of the nature and character of inferior courts—of
their dependence upon and subordination to legislative
power—was made less than five years before the forma-
tion and adoption of the present Constitution. The
convention framing, and the people adopting the Con-
stitution, were not ignorant of this judicial exposition;
and if presumptions are indulged, the presumption
must be, that if they intended any change in the nature
and character of these courts—to lessen their depend-
ence upon and subordination to the legislative power—
the intention would have been clearly expressed. There
is no expression of such intention in the Constitution.
On the contrary, all that relates to the institution of
such courts is expressed in the same words in which it
was expressed in all former constitutions. The only
change is, that the term of the office of the judge of such
courts, or the mode of election or appointment to the
office is not prescribed, but is committed, expressly com-
mitted, to the General Assembly. When a constitu-

tional provision has received construction, and is substantially adopted, or carried into a succeeding Constitution, the courts apply the rule which prevails in reference to the substantial re-enactment of statutes—that it is the intention of the law-giver to adopt the construction the original statutes had received.

The object of all construction is to ascertain and effectuate the intention of the people in the adoption of the Constitution. The intention is collected from the words of the instrument, read and interpreted in the light of its history. The general rules or principles employed are well defined. A cardinal rule is, that the Constitution must be carefully examined in its entirety. As an entirety, complete and harmonious in all its parts, or believed to be, it was framed by the convention of the representatives of the people. As an entirety, it was adopted by a single expression of the sovereign will of the people. There can be no fair or. just construction or interpretation, if it be limited to particular words or phrases, or the words or phrases of particular clauses. The whole. must be considered to ascertain the sense and significance, in which words or phrases are used in particular parts of clauses.—Cooley Const. Lim., 74. As has often been said, the Constitution is not the beginning of law—originally it was made by a people and for a people, among whom the common law prevailed, and who had statutes, judicial tribunals, a legislature, an executive, and all the agencies of government known to American institutions and jurisprudence. There can be no just construction or interpretation, effectuating the intent of the people, which is not deduced, not only from. the words, but, from the history of any particular part or provision of the instrument.—Cooley Const. Lim. 74; *People v. Angle,* 109 N. Y. 568; *Sweet v. City of Syracuse,* 129 N. Y. 316; *People v. Draper,* 15 N. Y. 537; *Ex parte Roundtree,* 51 Ala. 42; *Taylor v. Woods,* 52 Ala. 474; *Mayor v. Stonewall Ins. Co.,* 53 Ala. 570. Reading and construing succeeding constitutions in connection with the predecessors, we discover the changes they introduce— the ends or purposes it is proposed to accomplish, and the real meaning of words or phrases.

Keeping these principles and rules in view, further inquiry into the distinctive nature and characteristics of inferior courts, as they exist under the present Constitution, and as they existed under its predecessors, will aid materially in the solution of the immediate question for decision. The compensation of the judges of the county courts—the original of the inferior courts—was derived from fees, which the legislature could enlarge or diminish at pleasure.—*Benford v. Gibson*, 15 Ala. 521. The judge was invested with a dual capacity and jurisdiction—he was not only the judge of the County Court, but also of the Orphans' Court—the designation, so long as the County Courts existed, of the Court of Probate of the Constitution. The judges of all other inferior courts have been, and are now, compensated by salaries; but the salaries were and are payable from the treasury of the county, for which, or a division, or district of which, the court may be established, and not from the treasury of the State. The judges of the permanent, continuing courts of the Constitution—the judges of the Supreme Court, the chancellors, and the judges of the circuit courts—receive no fees or perquisites, they are compensated by salaries, payable from the treasury of the State, which cannot be diminished during their official term. A fixed term of office, and compensation incapable of diminution during the term, is deemed essential to preserve the independence of the judiciary of the creation of the Constitution. A like measure of protection could not be extended to inferior courts of legislative creation, without derogating from legislative power, and rendering them constituents of the permanent judicial system of the State. Chancellors, at discretion, may hold courts for each other. The judges of the circuit courts may, and, when required by law, must interchange. Judges of inferior courts have never been authorized to exercise judicial functions except in the particular courts of which they are judges; and it may well be doubted whether it is within legislative competency to confer such authority. Judges of the Supreme Court, of the circuit court, and chancellors, are prohibited, during the term for which they are elected, from holding any office (except judicial

offices) of trust or profit, under this State, or the United States, or any other power; a prohibition not extended to judges of inferior courts. We need not pursue further inquiry into the nature and characteristics of inferior courts, and their absolute dependence on legislative power for existence. Without a fixed term of office, without constitutional protection of their compensation, free from all prohibition to take other offices, the judges of the courts are separated and distinguished from the judges of the courts of the Constitution, as plainly as if the separation and distinction had been expressed in words directed to that purpose.

The Constitution of 1868 provided that "vacancies in the office of the circuit judge, judge of probate, or judge of any other inferior court established by law, shall be filled by the Governor; and the person appointed by him shall hold office until the next election day appointed by law for election of judge, and until his successor shall have been elected and qualified." The judges enumerated, it must be observed, had fixed terms of office, and an election by the qualified electors of the circuit, or of the county, or of the town, city or county, or district for which the court was established, was prescribed as the mode of filling the office. There was an omission to provide a mode of filling vacancies occurring in the office of chancellor, and in the office of judge of this court, supplied by an act of the General Assembly, approved March 7, 1873, conferring on the Governor general power to fill by appointment vacancies occurring in judicial offices.—Pamph. Acts, 1872-73, p. 83.

The constitutional provision now in question, is the successor—the substitute—for the corresponding provision of the Constitution of 1868; it relates to the same subject and has a like office to perform. The preceding provision related only to judges having a term of office, and a mode of election, prescribed by the Constitution. Then, as now, there was the frailty of the tenure of office of judge of an inferior court—then, as now, such courts were of legislative creation and subject to legislative destruction; but the mode of filling the office of judge, the Constitution prescribed; it was not within

legislative power. Read in the light of the legislative and judicial history of inferior courts; in connection with the corresponding provision of the preceding Constitution; and in connection with other sections and clauses of the article of which it forms part, the provision in question cannot by any fair, just construction, be extended to every officer exercising judicial power, though he may bear the title of judge or chancellor. It relates to the judges and chancellors nominated in the Constitution, and by the Constitution invested with judicial power. The abstract force of the words, "any of the judges or chancellors of this State," taken in the largest sense and significance of which they are capable, may comprehend judges of inferior courts, or any judicial officer taking place and authority from the laws of the State. Every public officer, judicial, ministerial, or executive, deriving place and authority from the Constitution or laws, is an officer of this State, and not of any other sovereignty or jurisdiction. If the mere abstract force of words be consulted, the intendant, or mayor, or recorder of municipal corporations, invested with a minimum of judicial power, the exercise of which is localized within narrow, defined territorial limits; or notaries public of the appointment of the Governor, authorized to exercise the jurisdiction of justices of the peace, may be said to be "judges of this State." Yet, that would not meet and satisfy the popular, familiar meaning of the phrase or expression, nor would it accord with the structure or frame of the government. The Constitution and legislation create two classes of public offices and officers—offices and officers of the State, and county offices and officers. They are agencies and component parts of the government, marked and distinguished by the nature and extent of authority conferred, and the sphere of performance of official duty.—*Ex parte Wiley,* 54 Ala. 226. Deriving existence and authority from a common source, general words or phrases used in a statute or in a constitutional provision, if taken in the largest significance of which they admit, may comprehend each class. Whether each class is comprehended, or the one only, depends not so much on the generality, or abstract force of the words, but upon the relation in which the words are found, and the

purposes of the statute, or of the constitutional provision.

It is not matter of controversy, that the Constitution reserves, expressly reserves, to the General Assembly, the power to provide the mode in which judges of inferior courts shall be elected or appointed. It is not, it cannot be, matter of controversy, that in respect to these judges and these courts, there is a change, a departure from the theory and policy of all former constitutions, which, though the courts were subject to legislative destruction, yet removed from legislative power, the tenure or term of office, and the mode of electing or appointing the judge. Since the abolition of the county courts, there has not been a system of inferior courts having uniformity of jurisdiction throughout the State. Such courts have been established by the General Assembly, to meet the necessities and conditions of particular localities. These necessities and conditions vary, and as they varied, there has been an adaptation of the grant of jurisdiction to meet them. The present City Court of Mobile was originally established as the "Criminal Court for Mobile county," and invested only with criminal jurisdiction, concurrent with that of the circuit court.—*Nugent v. State*, 18 Ala. 521. Since, there has been a change of its title, and an addition of civil jurisdiction concurrent with that of the circuit courts, except of actions involving titles to lands; but it has not been invested with equity jurisdiction. The city court of Montgomery, originally, was clothed with criminal and civil jurisdiction, (excepting from the civil jurisdiction, actions involving the title to lands), concurrent with that of the circuit court. Since, it has been invested with jurisdiction concurrent with that of the court of chancery. The jurisdiction of each court is localized and limited, to the particular county for which it is established. There is no necessity to refer to the variety of jurisdiction conferred on other inferior courts. The city court of Mobile and the city court of Montgomery illustrate that such courts are established, and jurisdiction conferred, to meet the varying necessities and conditions of particular localities. Can it be said, that uniformity in the mode of appointment or election, or in the tenure or term of office of the

judges of these courts, would meet the necessities and conditions of every locality for which the court may be established?   However that may be, the Constitution speaks for itself—instead of prescribing inflexibly the tenure or term of office of the judges of these courts, or the mode of their election or appointment, it commits to legislative power, as it commits the character or extent of jurisdiction, the determination of the tenure or term of office of the judges, and the mode of election or appointment.

There are judges and chancellors, who may with propriety be denominated judges and chancellors of this State, having fixed terms of office, the mode of election to which the Constitution prescribes, and to whom a measure of protection, adapted to the nature of their respective courts, against legislative invasion or interference, the Constitution extends.   Elective by a vote of the people, at the same time, there is uniformity in the duration of their official term; a uniformity first introduced by the Constitution of 1868, and preserved by the present Constitution.  Naturally and logically, it is to these judges and chancellors the constitutional provision refers.   By construction, there cannot be an extension of it to judges of inferior courts.   The extension would be a limitation upon, and in derogation of, the plenary power of the General Assembly, to prescribe the mode of election or appointment, and the tenure or term of office of these judges.   The office is now, as it has been at all times, of statutory creation; the mode of filling it and the duration of the term now lie exclusively in legislative discretion.   The power to create, accompanied with the express power to provide the mode of filling and the tenure or term of office, involves the power to provide the mode of filling vacancies occurring before the lapse of the appointed term.   The conclusion is, that reading and interpreting in its entirety, the article of the Constitution of which the section in question forms part, it does not invest the Governor with power by appointment, to fill vacancies occurring in the office of judge of an inferior court.   As to the office of judge of the City Court of Montgomery, the power exists; derived, not from the Constitution,

but from the act of February 13, 1879, to which reference has been made.

The act is entitled, "An act to authorize the Governor by and with the advice and consent of the Senate, to appoint the judge of the City Court of Montgomery." There was, at the passage of the act, an incumbent of the office, elected on the first Tuesday of November, 1874, having under the Constitution of 1868 a fixed, defined term of office; entitled to hold office, if there was not legislative abolition of the court, until the next general election of judges, and until the election and qualification of his successor. Under that Constitution and the existing legislation, the next general election would have occurred on the first Tuesday of November, 1880. The present Constitution entitled the incumbent to remain in office until that time—the expiration of the term for which he had been elected. It is in reference to, and in connection with these facts, the act must be interpreted. When analyzed, and so interpreted, the intention of the General Assembly is plain. There was before it a single subject, not naturally or logically divisible—the office of judge of the City Court of Montgomery, and the mode of filling it—and to this subject and no other, the act is devoted. The first section provides the mode of filling the office, upon the expiration of the term of the then incumbent. Until the expiration of that term, a new, original term of office could not commence—could not commence, because the Constitution provided for the continuance of that term, until its expiration according to the preceding Constitution. And it is the mode of filling the office in the future, after the expiration and without disturbance of the unexpired term of the incumbent, to which the section relates. The first section, with its limitation, having provided or prescribed, which word is used is not material, the mode of filling the office, the second section provided the tenure or term of office—it is "six years, and until the close of the session of the General Assembly, at which his successor is appointed and confirmed," as is provided in the first section. The two sections, therefore, exhaust the subject to which the act is devoted, with the exception of supplying, or providing the mode of supplying possible vacancies, the term of

office continuing. The clause of the second section, the validity of which is now assailed, relates to the filling of vacancies, and is in these words: "And in case of any vacancy in said office of judge of said city court, after the passage of this act, such vacancy shall be filled by the Governor, and the person thus appointed shall hold the office until the close of the next ensuing session of the General Assembly, and until his successor is appointed and confirmed." The act is in itself complete; it meets every condition and phase of the one subject to which it is devoted. Recognizing the continuance of the term of the prior incumbent, it first provides the mode of filling the office when that term has expired— it then provides the tenure or term of office; and then, it provides the mode of supplying possible vacancies, whether the vacancy is of the unexpired term of the then incumbent, or vacancies of subsequent occurrence; and it provides the duration of an appointment to fill a vacancy. The power of the General Assembly to enact the statute, is not the matter of controversy. The controversy is, whether the single subject to which the act is devoted is expressed in its title; or, to state the proposition precisely, whether the title is broad enough to comprehend the clause conferring on the Governor the power to fill vacancies.

The clause of the Constitution supposed to be offended, that "each law shall contain but one subject, which shall be clearly expressed in its title," excepting particular laws it is not now necessary to enumerate, has been of frequent consideration in this and other courts, and the rules governing the determination of all questions arising under it, are well settled. In passing upon the constitutionality of statutes, it is a universal rule, that all reasonable presumptions are indulged in favor of legislative action; before sentence of nullity is pronounced against it, the infraction of the Constitution must be clear; and to this unvarying rule, statutes supposed to be violative of this clause of the Constitution are not an exception.—*State v. Rogers,* 107 Ala. 444. It is not within the province of the courts to sit in judgment upon the title, and determine whether it could not have been drawn in some other form, more clearly or definitely indicating the subject to which the

body of the act relates. The legislature is not subject to judicial control in respect to the form or mode in which the subject of a law shall be expressed in the title. If the subject be expressed, the mandate and all the purposes of the Constitution are satisfied.—*People v. Banks,* 67 N. Y. 568. In *Ex parte Pollard,* 40 Ala. 77-98, it was said by A. J. WALKER, C. J.: "It is impossible to prescribe any standard of particularity for the legislature. The Constitution has not attempted to do so. It exacts from the legislature an announcement in the title of the subject, but does not dictate any degree of particularity. This is a matter left to the legislative discretion. * * * * * The object of the Constitutional provision was to prevent deception by the inclusion in a bill of matter incongruous with the title. The evil contemplated was not the generality and comprehensiveness of title. These faults do not tend to mislead or deceive." Further: "The particular subject selected by the legislature and put in the title must embrace every part of the law. The question must always be, whether, taking from the title the subject, we can find anything in the bill which cannot be referred to that subject. If we do, the law embraces a subject not described in the title. But this conclusion should never be attained, except by argument characterized by liberality of construction and freedom from all nice verbal criticism." The thought last expressed, that this clause of the Constitution must be liberally, not closely or narrowly construed, embarrassing legislation, has guided and controlled judicial decision. As is said by Mr. Freeman in note to *Davis v. State,* 61 Am. Dec. 339: "All the cases involving a discussion of this constitutional restriction are guided by this generous principle of liberal construction. While in a large number of decisions this doctrine is not announced, their tenor and effect show that the court in rendering them were controlled by its overshadowing influence."

Another of the rules observed, is that declared by STONE, J., in *Ballentyne v. Wickersham,* 35 Ala. 536: "That the title of a bill may be very general, and need not specify every clause in the statute. Sufficient if they are all referable, and cognate to the subject expressed. And when the subject is expressed in general terms,

everything which is necessary to make a complete enact-
ment in regard to it, or which results as a complement
of the thought contained in the general expression, is
included in, and authorized by it." The rule was an-
nounced and applied in *State v. Harrub*, 95 Ala. 176;
*Ex parte May. & Ald. of Birmingham*, 116 Ala. 186.

Tested by these general rules, we conclude, the title
of the act must be construed as expressing but one gen-
eral subject, comprehending all that constitutes its
body. It would be mere clinging to the letter and words,
to construe the title as restrictive, or limiting the sub-
ject of the act, to an appointment of the judge by and
with the concurring action of the Governor and Senate,
in all events and contingencies. The members of the
General Assembly knew, that the term of office of the
then incumbent would expire upon the meeting of the
next session of the General Assembly. They knew that
the office had ceased to be elective—they knew, if an in-
terregnum in the office was not suffered, that the mode
of filling it must be prescribed at that session, in the
exercise of the exclusive power to prescribe the mode
of filling it, the Constitution granted to the General
Assembly. The title of the act gave notice to the mem-
bers of the General Assembly, and to all specially in-
terested, that the purpose was the performance of the
duty devolved by the Constitution; and it is not partial
or fragmentary performance, the title expresses. In
general terms, it expresses as the subject of the act,
authority to the Governor by and with the advice and
consent of the Senate, to appoint the judge. But it is
not to be conceived, that it was unknown to the Gen-
eral Assembly, that vacancies in the office might occur,
when the General Assembly was not in session, and
there could not be an appointment by the concurring
action of the Senate and the Governor. Nor can it be
conceived, that it was supposed from the title, the fill-
ing of such vacancies was intended to be the matter of
other additional or supplementary legislation. Reading
the title in relation to and in connection with the leg-
islative necessity inducing the passage of the act, and
indulging the liberality or generosity of construction it
is a duty to indulge, the clause conferring on the Gov-
ernor the power to fill vacancies occurring during the

recess of the General Assembly is within the scope of the title—a mere subsidiary power, having relation to the general, main power conferred on the Governor and the Senate.

Let the judgment of the Circuit Court be affirmed.

McCLELLAN and HARALSON, JJ., concurring.

HEAD, J., *dissenting.*—We are asked by the information, in the nature of *quo warranto,* exhibited by the relator, John Gindrat Winter, to determine the constitutionality *vel non.* of so much of the act of the General Assembly of Alabama, of February 13, 1879, as provides for the filling of vacancies in the office of the judge of the City Court of Montgomery.—Acts, 1878-79, p. 418. The question has been zealously and ably argued by the counsel of the respective parties, and I approach its consideration, I trust, with a due sense of its importance, and in recognition of the principle that statutes are not to be set aside as offensive to the organic law, except for cogent reason.

The City Court of Montgomery was created by act of the General Assembly, as an inferior court, under the authority of the constitutional provision which will appear further on; and the act of the legislature of February 13, 1879, now in question (which was amendatory of previous acts on the subject), fixed the term of office of the judge at six years, as it had formerly been, and provided for his appointment, by the Senate, from three persons to be nominated to that body by the Governor. The second section of the act (the validity of which is now in controversy) provided, that "in case of any vacancy in said office of judge of said city court, such vacancy shall be filled by the Governor, and the person thus appointed shall hold the office until the close of the next ensuing session of the General Assembly, and until his successor is appointed and confirmed."

A vacancy in the office having arisen by the resignation of the incumbent, shortly prior to the meeting of the session of the General Assembly of 1896-97, the relator, Winter, was appointed by the Governor to fill it. At that time, there remained near two years of the

current term of six years. Winter accepted the appointment, qualified and entered upon the discharge of his official duties, and continued therein, unmolested, until the close of the next ensuing session of the General Assembly, in February following. During the sitting of the Senate, the Governor, responding to the requirement of the act of February 13, 1879, above copied, nominated to that body three persons, including the respondent, A. D. Sayre, as the persons from whom should be appointed a judge of the said city court. The Senate, likewise treating the said act as a valid enactment, received the nominations from the Governor, and appointed the respondent to be judge of said court. The relator, as we have said, now questions the constitutional validity of the enactment, and the proceedings under it, basing his contention upon alleged violations of two constitutional provisions; and contending thereon,

I. That section 17, Article VI, conferred the power of appointment, in such cases, upon the Governor exclusively, covering the entire unexpired term of the office; and,

II. That the title of the act does not conform to the requirements of section 2, Article IV, that "each law shall contain but one subject, which shall be clearly expressed in its title."

In the division of the powers of the State government into three departments, the Constitution, in section 1, Article VI, ordains, that "The judicial power of the State shall be vested in the Senate, sitting as a court of impeachment, a supreme court, circuit courts, chancery courts, courts of probate, *such inferior courts of law and equity, to consist of not more than five members, as the General Assembly may from time to time establish,* and such persons as may be by law invested with powers of a judicial nature." (Emphasis mine.)

The remaining provisions of the article provide for the organization, jurisdiction, powers, rights, etc., of the several tribunals, and the judges thereof. Reaching sections 12 and 13, we find them devoted to providing how the judges of these tribunals are to be selected. Thus, by section 12, the justices of the supreme court, the judges of the circuit and probate courts and chan-

cellors shall be elected by the qualified electors, etc.; and by section 13, the judges of such inferior courts of law and equity as may be by law established shall be elected or appointed in such mode as the General Assembly may prescribe.

To this point, no reference is made to vacancies in the offices of any of the judges, nor how the same shall be filled, but, after making some other essential provisions in sections 14, 15 and 16, we find section 17 introduced, devoted to that subject. It reads thus: "Vacancies in the offices of *any of the judges* or chancellors *of this State* shall be filled by appointment by the Governor; and such appointee shall hold his office for the unexpired term, and until his successor is elected or appointed and qualified." (Emphasis mine.)

These are the provisions of the Constitution which bear directly upon the first question presented, and are of controlling importance in its solution.

Preliminary to a discussion of the question presented, I remark, generally, that in the investigation of the constitutionality of an act of the legislature, it is the duty of the court to determine, first, what the Constitution, in express terms, or by just implication, means or requires, touching the subject of legislation under review, and this must depend upon the reading of the Constitution itself. The provisions of the *enactment* assailed, cannot be consulted to give interpretation, shade or coloring to the language of the Constitution, except in so far as the same may be regarded as the expression of opinion of a body entitled to consideration at the hands of a court. The meaning and requirements of the Constitution being ascertained from the language of the instrument itself, taken as a whole, there is a general presumption that legislative enactments are conformable to them; and such enactments will be so held by the courts unless they plainly appear to be otherwise. Any reasonably fair construction of an act, conforming it to the Constitution, will be adopted, rather than an obnoxious one, though the latter might seem more plainly to have expressed the legislative intent.

In expounding the Constitution, it is elementary that the intention of the framers must be sought for in, and be deduced from a consideration of, every provision of

the instrument having any legitimate bearing upon the question involved, giving proper effect to every word and clause. If a positive requirement, expressed in ordinary and unambiguous language, be found, effect will be given to it according to the ordinary meaning of the words employed, unless qualified by some positive provision of the context, or some provision clearly evincing, by implication, a purpose so to qualify it. In other words, the constitutional convention will be supposed to have understood ordinary words employed by it, according to their usual and ordinary signification, and a requirement of the instrument, couched in language of this character, conveying within itself a certain and definite meaning, will not be made to yield to implications which may be reconciled to the positive requirement, or which do not evince an adverse spirit, so manifest, as to force the mind to conclude that the positive requirement was not intended to mean what it declared.

Again, sectional or other subdivisions of a constitution are, generally speaking, for the sake of method and convenience. The instrument itself is an entire thing, composed of its several subdivisions. In determining what its framers intended to ordain on a given subject, as a rule, we blot out subdivisions, and look to the whole, having any relation to the given subject, as one declaration; and if any part of the whole qualifies or explains another part, we recognize that effect and give it operation accordingly.

As said by BRICKELL, C. J., in *Carroll v. State*, 58 Ala. 396: "The safe rule of constitutional construction, is to regard, not so much the form or manner of expression, as the nature of its provisions, and the end to be accomplished, giving its words their just and legitimate meaning."

These are elementary truths concerning the exposition of all written laws, constitutional or statutory, and in the light of them, it is proper to consider the special provisions now brought in question.

It is to be noticed that said section 13, above referred to, viz., that which provides that, "The judges of such inferior courts of law and equity as may be by law established shall, be elected or appointed in such mode as the General Assembly may prescribe," is silent as to

the duration of the terms of the judges, and as to vacancies occurring in their offices. The only express mandate of the whole provision is, that the judges referred to, shall be elected or appointed in such mode as the General Assembly may prescribe.

As to the term of office, it will not, I think, be doubted that the constitutional convention not only realized the implied, inherent power of the legislature, in the absence of action on its own part, to prescribe the terms of judges of such inferior courts, but that it actually contemplated that, whenever such a court should be established, the legislature would affix to the office of the judge a definite term. From the long history and practice of governments, in this country, and as essential to orderly administration of government, in all its departments, fixed duration of official tenure is inseparable from the conception of a public office. The Constitution gave further evidence of this contemplation, when in section 22 of the same article, it provided that the clerks of such inferior courts shall hold office *during the terms of the judge,* etc. I doubt if a public office was ever created in this State, without a provision fixing the *term* of the incumbent. It was fixed at six years, in the creation of the City Court of Montgomery, and such is and has ever been, the recognized official term of the judge of that court.

Nor can it be doubted, for an instant, that said section 13, uninfluenced by any provision of the context excluding the power, left open, and in full force, the implied, inherent power of the legislature to provide how vacancies in the office of a judge of an inferior court created by it, should be filled; and if there be, in the Constitution, no such restraining or qualifying provision, that implied power necessarily operates; and, of consequence, any mode of filling such vacancies which the legislature might prescribe, would be unassailable. Placing the section, then, by itself, upon its broadest ground, it provides, expressly, that the legislature, when it establishes an inferior court, shall prescribe how the judge thereof shall be elected or appointed, and, impliedly, how vacancies occurring in his office shall be filled.

So that, we see, plainly, the whole controversy turns upon the inquiry whether this implied authority is restrained or controlled by any other provision of the Constitution; and this inquiry narrows itself to one other, viz.: Does the expression, *"any of the judges or chancellors of this State,"* found in section 17, include "judges of such inferior courts of law and equity, * * * * as the General Assembly may from time to time establish?"

Going back to section 1 of this judicial article, and the scheme of the convention, in creating and defining the judicial department of the State government, is apparent. The purpose, manifestly, was, first, to create, as fixed organisms beyond legislative control, such tribunals for the administration of justice, as would ordinarily and reasonably answer the necessities and demands of the people. These were to be the people's tribunals, fixed by the organic law; irrepealable by any mere legislative power. They were intended to secure to the people the all important function of a stable and reasonably sufficient judicial system, without which well administered government could not exist. Hence, after declaring the functions of the Senate as a court of impeachment, section 1 established, as such fixed tribunals, a supreme court, circuit courts, chancery courts and courts of probate; other sections defining their jurisdictions and powers; and, to render the system more efficient, the convention proceeded, in other sections, not only to form plans and machinery of organization, prescribe qualifications of officers, etc., but to adopt safeguards against legislative interference, touching rights of judicial incumbents, providing, for them, fixed and unalterable terms of official tenure, and, except as to judges of probate, securing to them a compensation for their services which shall not be diminished during their official terms; and to make these tribunals essentially the people's, it was provided, as we have seen, in section 12, that the judges of them shall be elected by the people. Secondly: The convention wisely contemplated, indeed, experience had taught its members, that recurring exigencies, fluctuations of trade and business, etc., would give rise, in some localities, to necessities for additional tribunals, of greater

or smaller jurisdiction, and of longer or shorter duration, but which it was not in the wisdom of the convention to well anticipate, and not within the economy of the State to provide as permanent courts. Hence, to meet these wants, as they might arise, the convention left it to the legislature to provide such additional tribunals, with such jurisdiction, either of territory or subject matter, and to be continued in being so long, as, in its wisdom, might be determined. It thus seems plain, why no term of office was fixed, by the Constitution, for the judges of these courts; for the term, if so fixed, might extend beyond the existence of a necessity for the continuance of the court; and why such judges were not required to be elected by the people; for a court might necessarily be created at a time when no general election was near at hand, necessitating a special election, howsoever limited in jurisdiction and importance the court might be.

But, notwithstanding these large powers given to the legislature, in respect of these inferior courts, it is of the utmost importance to remember, that said section 1, which ordains of what the judicial department of the State shall consist, declares, in terms incapable of two meanings or constructions, that these inferior courts when established shall constitute a part of the State judicial department; and the judges thereof, when elected or appointed, are as much a part of the State judiciary—"judges of this State"—as the judges of this —the Supreme Court—or any other court defined by the Constitution as being a part of the judicial department. This is not only conclusively shown by said section 1, but it is enforced and emphasized by provisions which follow, regulating, in certain respects, such inferior courts. Thus, as in section 13, providing how the selection of the judges of inferior courts shall be made; and, as in section 14, that judges of the city court shall have been citizens of the United States and this State for five years, next preceding their election or appointment, and shall not be less than twenty-five years of age, and learned in the law; and in section 16, that the judges of the inferior courts, within their respective jurisdictions, shall be conservators of the peace; and, as in section 18, regulating the appointment of special

city court judges when the incumbent is incompetent to sit in a cause; and, as in section 20, which provides that "No judge of any court of record in this State shall practice law in any court of this State, or of the United States;" and lastly, as in section 22, that the clerks of said inferior courts shall be appointed by the judges thereof, and shall hold office during the terms of the judges making such appointments.

I will remark just here, in passing, in reference to said section 20, that, in laying its injunction upon the members of the judiciary engaging in the practice of law, it uses, practically the same general character of expression, to denote the judges intended to be restrained from practicing law, as is used in section 17, in reference to the filling of vacancies. Section 20, has, of course, no reference to judges (if there were such) who are not State judges—judges recognized by the Constitution as being members of the State judiciary—and yet, no one would, for a moment, insist that the inferior court judges are not such as are restrained by this provision from practicing law. If there is a practical difference between the manner in which the judges who are intended to be restrained from practicing law are designated by section 20, and the manner in which section 17 defines the judges who are subject to its provisions, as to vacancies, I am unable to perceive it; and as the majority hold that, *"any of the judges of this State,"* as expressed in section 17, does not include inferior court judges, it seems to me to follow, upon the same principle, that, *"no judge of any court of record in this State,"* as expressed in section 20, does not include them, and that, consequently, those judges may practice law. I cannot agree to either conclusion. Beyond all question, it seems to me, these courts, and the judges thereof, by virtue of these provisions, are of the same constitutional recognition, as parts of the State judicial department, and State judiciary, as any of the other courts or judges provided for. It would have been impossible for the convention to have demonstrated the fact, more effectually, unless it had said, in set phrase that "the judges of said inferior courts shall be deemed judges of the State." Hence, it would, I think, be doing violence to a demonstration to say, when the framers of

the Constitution wrote and adopted section 17, and declared therein that vacancies in the offices of *"any of the judges* or chancellors *of this State"* shall be filled by appointment by the Governor, etc., that they did not intend to include judges of the inferior courts. Can it be conceived that a deliberative body, so solemn as a constitutional convention, met to ordain a system of government for a great State, used words so plain and unambiguous, as to be capable of but one grammatical, logical, or practical meaning—words not in the least conflict with any other provision of the instrument, but in strict accord with every other provision thereof—without intending the natural import of the words so used? I have yet to find a canon of construction by which such a proposition may be supported.

Following the general rules of construction expressed in a former part of this opinion (the correctness of which, I apprehend, none will deny), let us, as a further test, do away with form and method, strike out sectional numbers, bring the sections, material to be considered, together as one provision, and formulate it thus:

"The judicial department of the State shall consist of the Senate, sitting as a court of impeachment, a supreme court, circuit courts, chancery courts, courts of probate, such inferior courts of law and equity, to consist of not more than five members, as the General Assembly may from time to time establish, and such persons as may be by law invested with powers of a judicial nature. The judges of said supreme, circuit and probate courts, and chancellors, shall be elected by the people, and shall hold their offices for six years, which shall not be affected by any change afterwards made by law in any circuit, division or county as to the mode or time of election; and, except the judges of probate, shall receive for their services a compensation which shall not be diminished during their official terms. The judges of said inferior courts of law and equity shall be elected or appointed in such mode as the General Assembly may prescribe; and vacancies in the offices of any of the judges or chancellors of this State, shall be filled by appointment by the Governor," etc. ·Does not this formulation truly (almost literally) state the sub-

stance and portray the meaning of the several sections which bear upon the question under discussion? There cannot, it does seem to me, be a well founded doubt of it; and, if not, the correctness of the conclusion I am endeavoring to maintain cannot be denied.

In the application of section 17 to them, there can be, in my opinion, no distinction whatever, between sections 12 and 13 of this judicial article. Section 12, which provides for election of certain of the judges by the people, standing alone, leaves open, and in force, the implied, inherent power of the legislature to provide the mode of filling vacancies occurring in the offices of those judges, precisely as I said was true of section 13, which provides that the judges of the inferior courts shall be elected or appointed in such mode as the General Assembly may prescribe. The implications of both sections are the exact equivalents of each other. If, because section 13 provides that inferior court judges shall be elected or appointed, in such mode as the General Assembly may prescribe, it necessarily follows that the filling of vacancies in their offices shall be subject to the same rule, why, upon the same principle, should we not declare, that because section 12 provides that the other judges shall be elected by the people, it follows that vacancies in their offices shall be filled in the same way? I think neither conclusion is sound. Eliminate section 17, and it would be within legislative power to prescribe how vacancies in the offices of any of the judges shall be filled; those elective by the people under section 12, as well as those elective or appointive, at the will of the legislature, under section 13. Then, (if I may be permitted to be emphatic) what conceivable, possible reason is there for saying that section 17 is applicable to the elective judges under section 12, but not to those elective or appointive, at the will of the legislature, under section 13? Why not as well say that it is applicable to the latter and not to the former? If section 13 is to be isolated from the other provisions of the Constitution, and the implied legislative powers which arise from it, so isolated, are to be regarded as in force, why should section 12 be not, in like manner, isolated, and its implied legislative powers regarded as

in force also, leaving section 17 no field of operation at all?

When we consider reasons and motives for the adoption of section 17, it was most natural and proper, I think, for the convention to apply it to the entire State judiciary. The section is both a self-executing legislative provision, and a limitation upon the power of the legislature. It places it beyond legislative power to provide for filling vacancies in the offices to which it refers.—*Fox v. McDonald,* 101 Ala. 51. The manifest purpose was to fix a convenient, expeditious and inexpensive method of filling these vacancies, by conferring the appointing power upon the chief executive, placing it beyond the power of the legislature to require expensive and disturbing special elections, or other less convenient or expeditious means of filling them. It was of the highest importance, and so contemplated by the convention, that the administration of justice should not be seriously delayed by sudden or unforeseen casualties or events occurring to render vacant judicial offices; and this incentive applies, with equal force, in respect of all courts organized and engaged in the administration of justice—a city or other inferior court of law or equity, as well as a circuit or chancery court. But, whatever may have actuated the convention, it is certain that its members, impelled by some motive, saw it wise and proper to withdraw from the control of the legislature the subject of filling vancancies occurring in the offices of "any of the judges or chancellors of this State," and to regulate that subject themselves. The very fact of the constitutional requirement that vacancies in the State judicial offices shall be filled by the Governor, is conclusive of some necessity for withdrawing legislative control of the subject; and whatever that necessity may have been, none can be thought of which is not as applicable to judges of city and other inferior courts, as any other tribunals. Can we conceive of a necessity for a vacancy in the office of the circuit judge who presides in Montgomery county, for instance, or in the office of the judge of probate, being filled by appointment by the Governor, which does not apply, with the same force, to the City Court of Montgomery, for instance? If it was unwise, I repeat, that some of our tri-

bunals, engaged in administering justice, whenever a
sudden, unexpected vacancy might occur by death, res-
ignation or removal, should be subjected to the chang-
ing notions of recurring legislatures, in respect of fill-
ing vacancies, entailing, it might be, delays of justice,
public inconvenience and expense, it was, in the same
degree, unwise to have our city and other important
tribunals so subjected. So, the Constitution, not only,
in plain, unambiguous and unequivocal language, made
the provision apply to all alike, but it was most nat-
ural and wise that it should have done so. We know,
from many years' experience, that our city courts,
which have existed in the larger cities, are among our
most important tribunals. Their jurisdictions usually
combine both law and equity, concurrently with the
circuit and chancery courts, and, territorially, extend
to the limits of the counties in which they exist. They
administer the same public justice of the State that the
circuit and chancery courts do. .

It is insisted that the clause of the act of 1879, which
would provide for the filling of vacancies in the office
of the judge of the City Court of Montgomery, is no
more than the exercise of the power which it is said
that the legislature had, (a power which no less a judge
than the eminent RUFFIN, of North Carolina, most
ably combated.—*Hoke v. Henderson,* 4 Dev. Law, 104;
25 Am. Dec. 677), of changing the term of the office of
the judge of the said court—a power thought to be akin
to that of abolishing the court entirely. This is evi-
dently a mistaken conception. The act did not touch
the subject of changing the *term of office;* indeed, it ex-
pressly re-affirmed pre-existing acts fixing the term at
six years. There was no indication, either in the title
or the act itself, of a purpose to change the term. The
term had the same beginning and the same ending after
as before the act. The act, conceding it valid, in its en-
tirety, did not pretend to have such an effect, as that the
term which Winter was filling out as the appointed suc-
cessor of the successor of the incumbent in chief, would
expire at the close of the ensuing session of the General
Assembly; but its effect was such that *Winter's incum-
bency* of the *unexpired term* should then cease—the re-
mainder of the unexpired term of six years to be filled out

by the appointee to be made by the Governor, by and with
the advice and consent of the Senate. The changing of
the duration of the term of an office, and the filling of
vacancies during the term, are quite different subjects.
The title of the act is "An act to authorize the Governor,
by and with the advice and consent of the Senate, to
appoint the judge of the City Court of Montgomery."
The court was then an existing tribunal, created long
before, with the term of the judge fixed by law at six
years. This title, it is plain, has no reference to a
change in the *term of office*. It relates alone to the *ap-
pointment of the judge.* This is not only true of the
title, but there is not a word or expression in the act
itself indicating any intention whatever to change the
existing legal term of six years. The beginning and
the ending of the term, I repeat, were the same as be-
fore the passage of the act. The first section provides
that after the expiration of the *term* of the then incum-
bent (thus preserving his full term) the judge of said
court shall be appointed, etc.; providing for his appoint-
ment by the Governor, by and with the advice and con-
sent of the Senate, as before stated. The second sec-
tion provides, that the judge, so appointed and con-
firmed, shall hold his office for six years, and until the
close of the session of the General Assembly at which
his successor is appointed and confirmed. Here, it
plainly appears, that the legislature intended that a
successor of the said judge first chosen, shall be chosen
by the Governor and Senate at the session next before
the expiration of the term of six years of such first in-
cumbent; and so on, thereafter, every six years; thus
recognizing the six years term of the office. I suppose
such has been the universally received interpretation of
the act, and such the practice under it, ever since it was
passed. By virtue of it, Judge Arrington was elected
at the session of 1892-93, and his term will have expired
at the close of the session of 1898-99. Those appointed
on his resignation or death, were appointed, as in all
other such cases, to fill vacancies—to fill out Judge Ar-
rington's unexpired term; and, in no sense, to take and
hold new six-years terms of their own. The said sec-
tion then proceeds with the clause, in controversy, to
the effect that if a vacancy in the office occurs it shall

be filled by the Governor, and the person appointed shall hold the office until the close of the next ensuing session of the General Assembly, and until his successor is appointed and confirmed. This is the clause which it is contended for respondent, that the legislature did not enact in the exercise of a power to provide for *filling vacancies* occurring in the term, but in the exercise of the power, not taken away by any provision of the Constitution, to *change the duration of the term,* or to abolish the court entirely. It is manifest, to my mind, that this clause evinces no such legislative thought or intention. The subject of changing the official term as it was then fixed and established by law never entered into the mind of the legislature, enacting this clause. If the contrary contention should be accepted, let us see the results to which it would lead. For illustration: Judge Arrington was elected at the session of 1892-93; his term, as then fixed by law, was six years, expiring at the end of the session of 1898-99. If he had died, say, one year after entering upon his term, his successor to be appointed, under the act in question, to fill the vacancy, would hold until the close of the next ensuing session, and then, by virtue of the accident of Judge Arrington's death, the existing law would be changed, the existing legal term of six years would be cut down to two years, and a new term of six years would then begin. If Judge Arrington had lived, say, three years of his term and then died, his successor, to fill the vacancy, would hold until the close of the next ensuing session, and then, by the same accident, the existing law would likewise be changed, and Judge Arrington's term of six years would be cut down to four years, and a new term would likewise begin. Again in the first contingency above mentioned, the *new term* which began *two* years after the beginning of Judge Arrington's term, would be filled by an incumbent in chief appointed by the Governor, by and with the advice and consent of the Senate, to hold the new term of six years; and, in the event of *his* death, say, a year after his election, the same proceedings would go on as in the case of Judge Arrington's death, and the person elected to succeed him, at the next session after his death, would, himself, be an incumbent in chief,

also entitled to a full six years term. Thus it might
be, that the six years term, fixed by law, which Judge
Arrington started out to fill, would be divided up into
as many new terms, entered upon by new incumbents
in chief each beginning with the right of six years, but
liable to end at any time, as there might be vacancies
to occur by reason of the death, resignation or removal
of a judge; and the length of these terms, which may
be actually held, will vary according to the length of
time the several incumbents may continue in office.
The beginnings and ending of the official terms of the
judges of the City Court of Montgomery will depend on
the contingencies of deaths, resignations and removals
from office of men. Can any one suppose that the legis-
lature ever conceived of anything so unusual and im-
practicable? No, if there had been any intention to
make any change in the law, in this respect, there would
have been at least some allusion to it, in the act. It is
important that the terms of office have a legally ascer-
tained beginning and ending. The courts are required
to take judicial notice of the officers of the State. They
are bound to know when the term of every officer begins
and when it ends. With the law in the remarkable
shape above depicted, it might strain the judicial power
of the courts to find out and know when the term of of-
fice of a particular judge of the City Court of Montgom-
ery began, and, surely so, when it would end. I quote
here some pertinent observations of the Supreme Court
of Missouri on this subject: "I. As to the first ques-
tion: The phrase 'term of office,' in ordinary parlance,
means the fixed period of time for which the office may
be held. And we have a statutory rule for the construc-
tion of statutes, requiring that, in construing statutes,
'words and phrases shall be taken in their plain, ordi-
nary or usual sense,' except that 'technical words and
phrases, having a peculiar and appropriate meaning in
law, shall be understood according to their technical
import,' R. S. 1879, Sec. 3126.

"Going to the standards of our language, we find that
*a term* means 'the time for which anything lasts; any
limited time; the term of life.' Webster's Dict. And
turning to authorities, they announce that 'the expres-
sion, term of office, uniformly designates a fixed and

definite period of time.'—Anderson's Law Dict., 1023;
*People v. Brundage*, 78 N. Y. 403, 407; *Baker, Governor v. Kirk*, 33 Ind. 517. So that whether we take the
phrase 'term of office,' in its ordinary or popular sense,
or in its technical import, it means one and the same
thing: 'A fixed and definite period of time.'

"Of course, every such period of time, in order to be
'fixed and definite,' must have a point of beginning and
a point of termination equally fixed and definite. Now,
if it can be ascertained *when* the 'term of office' of the
first appointee of the Governor under the revision of
1879 began, it would seem not difficult to reach a correct conclusion as to when the terms of office of the
successive and subsequent appointees of the executive
began and ended.

"The statute is silent on the point as to the beginning
of the first appointee's term, and the reason for this is
most obvious, since the power of appointment being
lodged in the executive, it belonged to him in fact, if
not in law, to determine the time of the inception of the
actual official term of such appointee; the duration of
that term was already fixed by law. But if the legislature, being possessed of the power, *had* fixed the date
of the commencement of the first appointee's official
term, it would not be questioned that such initial point,
being once made sure and steadfast, would recur at
every corresponding period of two years. This must
be true, or else the premises from which this conclusion
is drawn, sustained as it is by authority, that a 'term
of office uniformly designates a fixed and definite period
of time,' must be false. As the legislature did not fix
the date when the official term of the first appointee
under the new law was to begin, this date was necessarily left to be fixed by the appointing power; but, *when*
fixed, the determination thus reached must have been
as effectual in all its incidents and consequences as if
previously made by the legislature. This also must be
true, or else it must be true that the executive was incapable of fixing such initial point, and that, therefore,
*it never was fixed*, which is an impossible, as well as an
absurd, supposition."—*The State ex rel. Withers v.
Stonestreet*, 99 Mo. 361, 372.

At the time of the passage of said act the existing law required the judge of said court to be elected by the people, as circuit judges were.—Acts of 1863, p. 121; Acts of 1869-70, p. 47. The purpose of the act in question was simply to change that requirement by providing for the appointment of the judge in the manner therein specified. It had no other object.

It has been argued also, that to accord to said section 17 the meaning I give it, would be to declare that so long as the incumbent in chief was in office the legislature would retain its power to abolish the court, or to shorten the term of the judge, whereas, when the appointee of the Governor, to fill a vacancy, is in office, that power would not exist; producing the unnatural result of giving to the appointee a more stable tenure than had the incumbent in chief. This is an error growing out of a misinterpretation of the provision of section 17, to the effect that the appointee shall hold for the *unexpired term*. This provision does not undertake to point out what constitutes an "unexpired term." It does not say that the appointee shall hold for the unexpired portion of the term for which the incumbent in chief was appointed or elected, as the same was fixed by law at the time of such election or appointment, nor anything of that import. It merely gives to the appointee of the Governor so much of the term, as fixed by law, as may lawfully remain after his appointment. If the court should be abolished the next day, his tenure would cease with it. If the legislature, (conceding it the power to do so) should shorten the term, his tenure would expire at the end of the term as so shortened.

I was, at one time, disposed to think that, under the act itself, the person appointed by the Governor, viz., the relator, by virtue of the provision that such an appointee shall hold until his successor is appointed and confirmed, was entitled to hold until the appointment of a judge, to be regularly made by the Governor and Senate, at the regular session for that purpose,.viz., the session of 1898-99. A strict construction of the act might lead to this conclusion, but upon due consideration, I am of opinion that, taken in connection with the other limitation of such appointee's tenure, viz., that

he shall hold until the close of the next ensuing session of the General Assembly, a legislative intention is shown to make the appointment provisional only, to be effectual until the Governor and Senate, could, by the meeting of the General Assembly, exercise their implied power of filling the vacancy. The principle is clear that the power to appoint to an office, in the absence of a provision to the contrary, includes, by implication, the power to fill a vacancy in it, (19 Am. & Eng. Ency. Law, 430); and applying this rule to the present case, the Governor, by and with the advice and consent of the Senate, being invested with the appointing power, was impliedly invested with power to fill vacancies in the same manner. So that, if the act is not subject to the objection, that the Constitution confers upon the Governor the exclusive power to fill vacancies, and secures to the appointee the entire unexpired portion of the term, as I have endeavored to show is true, the course pursued by the Governor and Senate, leading to the appointment of the respondent, was the proper one, and the respondent is entitled to hold for the unexpired term.

This consideration also leads to the conclusion, that it is immaterial whether the other constitutional objection raised by the relator, viz., that the vacancy clause of the act was not included in the title, is well taken or not; for, if we eliminate that clause, as being unconstitutional, in the respect mentioned, the first section of the act, as I have said, impliedly authorizes the Governor, by and with the advice and consent of the Senate, to fill vacancies. There was in the statutes existing at the time of the passage of the act, so far as I am advised, no special mode provided for filling vacancies in the office of judge of this court, which, it can be said, was continued in force after the act. Prior to the act, the office was elective. By it, the office was made appointive, and the change carried to the appointing power, by implication, authority to fill vacancies.

Profoundly impressed, as I am, with the great importance of the principles involved in this controversy, and being unable to entertain a doubt, in my own mind, that my brethren of the majority are in error in the conclusion they announce, upon the principal question

herein discussed, I am, with diffidence, constrained to express this my most earnest dissent.

COLEMAN, J., concurring.

MCCLELLAN, J.—I concur in the result flowing from the opinion of the Chief Justice, viz., the affirmance of the judgment of the circuit court.

I also concur in the conclusion reached by him that section 17 of Article VI of the Constitution has no relation to appointments to fill vacancies in the office of judge of the City Court of Montgomery; and this both upon the considerations adverted to by him, and upon others to which I will presently refer.

Whether the provision of the act of February 13th, 1879, entitled "An act to authorize the Governor, by and with the advice and consent of the Senate, to appoint the judge of the City Court of Montgomery," which is in the following words: "And in case of any vacancy in said office of judge of said City Court, after the passage of this act, such vacancy shall be filled by the Governor," etc., etc., is within the title of said act, is a question upon which I have doubts. They are, however, of a nature which might be controlled by the rule which requires the resolution of doubt in favor of the constitutionality of legislative enactments, if it were essential to this case that that question should be decided. But, as I shall endeavor to demonstrate, that inquiry is not involved in this case.

So much with regard to the opinion of the Chief Justice and the points therein discussed. I now proceed to state my own position in the premises. In brief it is this: Under the act referred to there is and can be no such thing as an unexpired term of a judge of the City Court who dies or resigns. To the contrary, while every incumbent of that office appointed by the Governor, with the advice and consent of the Senate, is entitled to hold for the term of six years, unless he sooner dies or resigns, yet, if during that term he does resign, his term—the term covered by his commission—thereupon instantly ends, and if he dies, his term dies with him; and upon such death or resignation of the incum-

bent, no part of his term remains as an "unexpired term" to be filled by appointment.

Section 1, Article VI of the Constitution leaves the power of creating inferior courts—such as is the City Court of Montgomery—to the unlimited discretion of the General Assembly. Section 13 of Article VI provides that "the judges of such courts may be elected or appointed in such mode as the General Assembly may prescribe." There are no organic limitations upon the power of the General Assembly in respect of the terms of such judges. That the legislature might provide for life tenure—in which case, of course, there would be no "unexpired term" on the death or even resignation of the incumbent—cannot be seriously questioned. For like reason, it cannot be seriously doubted that the legislature might in express language provide that the term of the judge should be six years, and that upon the death or resignation of an incumbent, a successor should be appointed for a new term of six years and so on. Clearly in this latter case, as well as in the first suggested, there could never be any unexpired term of a judge going out of office by death, resignation, or removal pending the six years for which he was appointed. In such case the term would culminate upon the termination of his incumbency of the office, and the succeeding judge would, by the words of the law, take, not for that part of the original term of six years which his predecessor failed to serve because of his death, resignation or removal—not for any *unexpired term*—but for a new and independent term of full six years. There would in such case be no "unexpired term" to be filled by appointment, just as there would be no "unexpired term" upon the death of an officer appointed for life; and hence it is most clear in both the cases supposed that there would be no field for the operation of section 17, Article VI of the Constitution; upon a vacancy occurring from any cause the Governor could not appoint for the unexpired term since there could be no such thing; and having power under that section to appoint only in case of an unexpired term, the provision could have no application to the cases hypothesized.

Now the case last supposed is essentially the case under consideration. It is true that the act of Feb-

ruary· 13th, 1879, does not in so many words declare
that each term in the office of judge of the City Court
of Montgomery shall end upon the death, resignation
or removal of the incumbent, and that there shall be
no such thing as an "unexpired term" in said office;
but it does, in the plainest language, expressly declare
that the Governor and Senate shall appoint a judge of
the court at the next session of the General Assembly
after the death, resignation or removal of an incum-
bent, and that every judge appointed by the Governor
and Senate, whether in succession to a judge going out
of office before the expiration of the time for which he
was appointed, or to succeed a judge who had served
for six years, shall hold the office for six years—not for
any unexpired part of a precedent term of six years,
but for full six years—and until the close of the session
of the General Assembly at which a new appointment
is made; and this provision is obviously as clear and
unmistakable to the utter  exclusion of the  idea that
there can be any such thing as an "unexpired term" in
said office, as if the law-makers had said:   "There shall
be no unexpired terms in the office of the judge of the
City Court of Montgomery."   It requires only an ex-
amination of the act itself to demonstrate this.   It is
as follows:

"An act to authorize the Governor, by and with the
advice and consent of the Senate, to appoint the judge
of the City Court of Montgomery.

"SECTION 1. *Be it enacted by the General Assembly
of Alabama,* That after the expiration of the term of
the present incumbent, the judge of the City Court of
Montgomery shall be appointed in the following man-
ner:   The Governor shall nominate to the Senate three
persons, learned in the law, for said office, from whom
the Senate shall select one, and the person thus selected
shall be the judge of said City Court; but in case no one
of the three shall receive a majority of the votes in the
Senate, the Senate shall notify the Governor of its re-
fusal to confirm any one of the persons named, and the
Governor shall thereupon nominate three other per-
sons, and so on, from time to time, until one of the per-
sons thus nominated is confirmed by a majority of votes
in the Senate.

"SEC. 2. *Be it further enacted,* That the judge of the City Court of Montgomery, appointed and confirmed as provided in the preceding section, shall hold his office for six years, and until the close of the session of the General Assembly at which his successor is appointed and confirmed as above provided; and in case of any vacancy in said office of judge of said City Court, after the passage of this act, such vacancy shall be filled by the Governor, and the person thus appointed shall hold the office until the close of the next ensuing session of the General Assembly, and until his successor is appointed and confirmed.

"SEC. 3. *Be it further enacted,* That all laws and parts of laws in conflict with this act be and the same are hereby repealed."

Upon the terms of this statute, I take it that nobody can be found to deny or question that in case of any vacancy in the office of judge of the City Court of Montgomery, the Governor, filling the place temporarily meantime, shall at the next ensuing session of the General Assembly nominate three persons to the Senate for said office from whom the Senate shall select one, and the person thus selected shall be the judge of said court. This is not only the clear and necessary intendment supplied by the words used, but the intendment is reasonable in itself and in precise accordance with the whole history of the State in all cases where the legislature or the Senate constituted the appointing power in whole or in part, and also in accord with the State's history, at least prior to 1868, in respect of the election of judges by the people, as we shall see more particularly further on. To reach a different conclusion as to the meaning of this act, the legislature would have to be convicted of the absurdity of abolishing this court, by an act expressly intended to provide for its continuance, in failing to provide for any incumbency of the office after the session of the General Assembly next ensuing the death, resignation or removal of an incumbent, since it is clear that the *pro tempore* appointee holds only to the close of such session, when his successor is to be appointed if the court is to be maintained. We have then this case: A judge is appointed for six years. He serves three years and dies between

sessions of the General Assembly. His successor can-
not immediately be appointed by the Governor with the
advice and consent of the Senate, because the Senate is
not in session, and the matter was not deemed of suffi-
cient consequence to justify a provision for the conven-
tion of that body in extra session. A successor cannot
be appointed subject to future confirmation by the Sen-
ate, since that would be to defeat the legislative pur-
pose to give the Senate an original choice between three
persons. Hence, it is provided that a person shall be
appointed to discharge the duties of the office *ad in-
terim,* until the Senate convenes and can exercise its
discretion upon the nominations made by the Governor.
When the Senate does convene, the act requires the
Governor to submit or nominate to it three persons,
from whom, or from other three persons if they do not
confirm one of the first three, the Senate selects one,
and that one is the judge of the City Court, according
to the provisions of the first section of the act. The
second section of the act provides that every judge of
the City Court appointed and confirmed as provided in
the first section, that is every judge of said court se-
lected by the Senate from any three persons nominated
to that body by the Governor, shall hold his office, not
for any part of an existing term, not for any unexpired
term, but for the full term of six years. The words are:
*"That the judge of the City Court of Montgomery, ap-
pointed and confirmed as provided in the preceding sec-
tion, shall hold his office for six years, and until
his successor is appointed and confirmed as above pro-
vided."* It would seem superfluous to suggest that a
judge appointed in succession to one who dies, resigns
or is removed before he serves out the six years for
which he was appointed, is "the judge of the City Court
of Montgomery," as fully in every conceivable sense as
if the preceding judge had held out the six years and he
had then been appointed. And being "the judge" of said
court, and having been "appointed and confirmed as
provided in the preceding section," he is as clearly with-
in the terms of the further provision that he "shall hold
his office for six years," a new and independent and full
term, as if he had succeeded a judge who held for his
full term of six years. It is not denied by anybody,

but, to the contrary, conceded on all hands, that the legislature had full power as to the terms of office of the judges of the City Court of Montgomery. They could have made the tenure for life, as we have seen, or during good behavior, and in such case there could never be an unexpired term. They could have provided that the judge should be appointed at a stated time and every six years thereafter for the term of six years, and in such case there would be an unexpired term upon the death or resignation of an incumbent within six years from the date of his appointment. They equally had the power to provide that the term of each judge, the term each judge was entitled to hold, should be six years unless he died, resigned or was removed meantime, in which case, of course, the term would end with the incumbency, and there would be no unexpired term. How can it be said with any show of reason that section 17 of Article VI of the Constitution applies to the judge of the City Court of Montgomery, when the Constitution itself left it with the legislature to make that section impossible of application? The proposition seems to me to be palpably groundless; and this without regard to what the legislature has provided in the premises. Having under the Constitution this undoubted power to provide for an incumbency of office in such way that there could never be an unexpired term to be filled by the Governor, it is to my mind absurd to say that the same Constitution provided for the filling of an unexpired term in such office; and the absurdity is accentuated and emphasized when it is considered that the legislature acting within its constitutional powers has in fact provided for the incumbency of this office in such a way as that there never can be any unexpired term to be filled by executive appointment. For what the legislature has done as clearly shown by the act is this: They have provided that each incumbent by executive and senatorial appointment shall hold his office for six years, not that each term shall endure for six years—the word term is not used in the act except in reference to the then incumbent who was in for a fixed term of six years—not that the incumbency of the office shall be divided into terms of six years each, but that each judge so appointed shall be

entitled to hold the office for that period. The legisla-
ture could not make him hold it for that period, it
could not keep him from dying or resigning; but it
could secure to him the right to hold for that length of
time if he chose, and lived, to exercise it. And that is
what they have done and all they intended to do in this
statute. And they have done this with respect to every
judge appointed by the Governor by and with the ad-
vice and consent of the Senate. They have not marked
the office off into fixed terms with fixed times of election
with equal periods between. They have secured to the
incumbent the right to serve for a given period. If he
serves that period it is all well and good. If he dies,
or resigns or is removed, the period ceases; and the ap-
pointee who comes after him takes for a like period, not
for so much of the time his predecessor was entitled to
hold as he did not in fact hold, but for the full period of
six years initiated upon his confirmation by the Sen-
ate. The period which an incumbent is entitled to
serve—his term of service—ceasing on his death, resig-
nation or removal, even the *ad interim* appointment is
not for an unexpired term, or any part of an unexpired
term. In such case there is an office without an in-
cumbent, and a permanent appointment to it in the way
the legislature has prescribed cannot be immediately
made. It is, therefore, further provided that the Gov-
ernor, acting alone, shall fill the vacant judgeship till
the Senate meets. Such appointment may cover a
period of nearly two years or of only a few days; but,
however long or short the period may be, it is not for
any unexpired term; the term of service to which the
preceding incumbent was entitled having fully expired
upon the instant of his death, resignation or removal.

These considerations leave me without a shadow of
doubt that section 17 of Article VI of the Constitution
has no application whatever to appointments to the of-
fice of judge of the City Court of Montgomery; and that
the act authorizing the appointment of the respondent
to that office as and when he was appointed is entirely
constitutional and valid. And I am with equal assur-
ance of correctness of the further opinion, that his ap-
pointment entitles him to "hold his office for six years,
and until the close of the session of the General Assem-

[State *ex rel.* Winter v. Sayre.]

bly at which his successor is appointed and confirmed"
as provided in the first section of said act.

I propose now to notice, as briefly as may be, the ob-
jections that are urged to the views I entertain on this
matter and to the conclusion I have just announced.

It is said that an office without fixed terms commenc-
ing and ending at stated dates is such an anomaly in
our jurisprudence it is unreasonable to suppose that the
legislature could ever have intended its creation. A
sufficient answer to this suggestion is, that when the
language of the legislature is plain and unambiguous,
the reasonableness, the policy, the wisdom of the enact-
ment, if within organic competency, are not matters for
the consideration of the courts. The people in conven-
tion assembled having seen fit to leave these matters to
the legislature, the courts palpably transgress the well
defined limits of their altogether different powers when
they undertake to meddle with them.

But it is said that such a conclusion, that is that
terms of an office—or, more accurately in this case, the
terms incumbents of an office are entitled to serve—be-
gin with the appointment of an incumbent and end
either at the end of a given number of years thereafter,
or with his death, resignation or removal during those
years, would lead to such confusion and inconvenience
that we cannot suppose the law-makers to have ever so
intended. This is much the same as the last objection,
and the answer to it is much the same. The argument
of inconvenience, of confusion and difficulty in the
execution of a statute, can never prevail or be of any
consequence against the plain words of an enactment.

It is said that it is of much importance for the pub-
lic, and especially other courts, to know what are the
terms of office of the judges of the City Court of Mont-
gomery, and that upon this act, as I construe it, much
difficulty would be experienced in that regard, since two
or three or more full terms might have their inception
within a single period of six years, etc., etc., and that
it would be specially onerous upon the judges of this
court, as of other courts, to have to keep their judicial
knowledge abreast of the changes in judges, terms, etc.
of said City Court. I am not inclined to increase the
difficulties we already labor under on account of the

violent legal presumption which obtains as to the extent
and accuracy of our common knowledge; but it does
seem to me that if I can know and am forced to know
the signature of a man whom I have never seen or heard
of before simply because he is a public officer, if I must
know the prominent facts of all history, of the sciences,
of geography, of all the courses of nature, etc., etc., that
I would experience little difficulty, comparatively
speaking, in ascertaining from the journals of the State
Senate, one of the very few records which is required to
be and is printed and published broadcast, who was ap-
pointed and confirmed a judge of the City Court of
Montgomery, when he was so appointed, and conse-
quently when his term began and would end, if he sur-
vives and does not resign and is not removed.

But back of these considerations is one which com-
pletely overturns the whole argument of unwisdom, in-
convenience and absurdity made against giving to this
act the meaning its words require. Judicial office with
new and full terms commencing with the incumbency
of every appointee of the original appointing power,
and ending with the death, resignation or removal of
such appointee, so far from being anomalous or un-
heard of in this State, have been provided for in every
Constitution of the State, certainly down to 1868, and
have been tenanted from time to time by different in-
cumbents entitled to hold and holding for terms in no
sense uniform as to the initial or final dates thereof;
and the courts have not been sorely put to in respect
of their judicial knowledge of such terms, nor has any-
body ever supposed the system was unwise, or inconven-
ient or absurd. Under the Constitution of 1819, as
amended in 1830, all judges were elected by the legisla-
ture for six years. By another amendment adopted in
1849, circuit, probate and inferior court judges were
made elective by the people for six years, and it was
provided that judicial elections should be held in No-
vember (immediately changed by the legislature to
May) of each year whenever necessary to fill vacancies,
or rather to elect successors to such judges as might
die, resign or be removed before serving out the six
years they were entitled to serve. There was further
provision of law for the Governor to make temporary

appointments, the appointees to hold for the ensuing
session of the General Assembly when the primary ap-
pointing power was in that body, and to the next annual
election when the judges were elected by the people.
And thus the law stood from 1830 and 1849 at least to
1868, the constitutions of 1861 and 1865 making no
change therein. See amendments to Constitution of
1819 adopted January, 1830, and in 1849, §§177 and
626, Code of 1852; Constitution of 1861, Art. V, §§11
and 12; Constitution of 1865, Art. VI, §§11 and 12;
Code, 1867, §§218, 744, 745. Under these provisions,
and perhaps also under the Constitution of 1868, all
judges elected by the legislature or the people, as the
case might be, were entitled to serve six years, and this
whether the election in a particular case was in succes-
sion to a judge who had held for six years, or to one
who had died, resigned or been removed at any time
during the six years for which he had been elected; and
in all cases the term ended with the incumbency, and
the succeeding incumbent took a new, independent
and full term of six years if he should so long live, and
not resign or be removed. There was in no case nor
under any circumstances any such thing as an "unex-
pired term" consequent upon the death, resignation or
removal of an incumbent. The operation of this sys-
tem is fully illustrated in the following instances:
Judge Henry Goldthwaite was elected to the supreme
bench in the winter of 1836-37, and again in the winter
of 1842-43 to a second term. In June, 1843, in the first
year of his second term he resigned; but in the winter
of 1843-44 he was elected to succeed himself for a term
of six years, thus having entered upon two separate
terms of six years within a year. Judge Chilton re-
signed in 1855, in the midst of a term of six years. The
legislature was then in session, and elected Hon. A. J.
Walker to succeed him. Judge Walker held under this
election, not for that part of the time for which Judge
Chilton had been elected, which had not expired, but
for the full term of six years. And so it was with the
judges—circuit, probate and of inferior courts—elected
by the people. They each had terms of six years, that
is, each of them was entitled to "hold his office for six
years," the language of the law then of force and of

the statute we have here being identical in this respect. The constitutional amendment of 1849 required all these judges to be elected by the people, and that the "first election" thereunder should be held on the same day throughout the State. The legislature at once fixed the first Monday in May in each year for these judicial elections. And so in May, 1850, all the circuit judges were elected, and each one so elected was entitled to "hold his office for six years." Among others elected at this time were L. P. Walker for the 4th circuit, William R. Smith for the 7th, and George Goldthwaite for the 8th. Judge Walker resigned in February, 1852. On February 27th, 1852, John E. Moore was appointed by the Governor, to hold until the election in May following; and at that election Judge Moore was elected, and held under that election not until the time Walker's term would have ended had he remained in office, but until May, 1858, a full term of six years. He was then re-elected for a new term of six years and resigned in 1863.

Judge Goldthwaite also resigned in February, 1852. John Gill Shorter was appointed by the Governor to hold till the following May. Then Judge Shorter was elected by the people for a full term of six years, and continued in office under that election until May, 1858, when he was re-elected.

Judge Smith resigned in September, 1851. On the 15th of that month, Turner Reavis was appointed to succeed him till next election in May, 1852, when B. W. Huntington was elected for six years. Judge Huntington resigned, and was succeeded *ad interim* by Judge Reavis August 25th, 1853. Judge Reavis failing to hold until the time of election, A. B. Clitheral was appointed February 14th, 1854; and at the election in May following Edmund W. Pettus was elected for a term of six years. He, however, resigned in 1858, having served only four years of his term, but two years beyond the term of his predecessor, Judge Smith, elected in 1850. Thus there were two *ad interim* and three permanent judges of the 7th circuit within four years, and there was the initiation within that time of three separate and distinct full terms of six years each—the very case put by those opposed to my view to show that

such a thing is preposterous, unheard of, and impossible of conception. Many other instances might be given, but these will suffice.

Such was the law, therefore, in this State for many years, and such its uniform practical operation. It was never supposed to be an absurd law, and its execution did not put any insuperable burden upon the judicial knowledge of this court, or others, in respect of the terms of circuit and inferior court and probate judges in office; and this, though the record of their elections, etc., were not as accessible as if it had been embraced in the Senate journal. That it is not the law now as to all judges—of this court with the rest—is not due to any difficulties along the lines suggested; but to the consideration of the trouble and expense of holding so many elections, a consideration which became all the more important when Supreme Court judges and chancellors were also made elective by the people in the Constitution of 1868. This consideration has obviously no force in respect of offices filled by the legislature, or by the Senate or by the Governor in conjunction with the Senate; and in respect of such offices—in respect of all offices indeed as to which the original, primary and full appointing power can be conveniently invoked upon the death, resignation or removal of an incumbent—there is no reason or occasion for having fixed terms of tenure, extending beyond the death or resignation or removal of an incumbent, no reason or occasion whatever for "unexpired terms."

In view of the history of the State on this subject, and especially in view of the fact that no judge primarily elected by the legislature, or by the Senate, or appointed by the Governor with the advice and consent of the Senate, had ever in the life of the State been given a fixed term extending beyond his own incumbency, involving an "unexpired term" on his death, resignation or removal, it would have been surprising to the last degree and wonderful indeed if the General Assembly of 1878-79 had not intended just what they have expressed in this act, that judges appointed under its first section, whether succeeding a judge who has served six years or one who had died, resigned or been removed in that time, should hold for full terms of six years if they

should so long continue in office, thus wholly excluding the possibility of anything like an unexpired term.

I deem it unnecessary to pass upon the question whether the provision as to *ad interim* appointments is within the caption of the act. I am inclined to think it is, and should probably so hold if the decision of the point were necessary to a disposition of the case. But conceding it is not, the effect would be to invalidate the relator's *ad interim* appointment and to leave unaffected the permanent appointment of the respondent by the Governor and Senate. Thus my only doubt in the case goes to the integrity of Winter's temporary incumbency. Of Sayre's right to the office for six years from the time of the adjournment of the session of the General Assembly of 1896-97, I have no sort of doubt.

The foregoing opinion had not been reduced to writing when the case was decided; but I then stated my position orally, and said I would write down my opinion and file it in the cause. On consideration of the views above set forth, BRICKELL, C. J., and HARALSON, J., concur with me, that there can be no such thing as an unexpired term in the office of judge of the City Court of Montgomery, that for this additional, and itself quite sufficient reason, section 17 of Article VI of the Constitution has no application to the office of judge of said court, and that the respondent, Sayre, was appointed, and is entitled to hold the office, for the full term of six years.